(Decided 15th March, 1893.)

---

THE CENTRAL TRUST COMPANY OF NEW YORK *vs.* THE ARCTIC ICE MACHINE MANUFACTURING COMPANY. THE ARCTIC ICE MACHINE MANUFACTURING COMPANY *vs.* THE CENTRAL TRUST COMPANY OF NEW YORK. THE MARYLAND ICE COMPANY *vs.* THE ARCTIC ICE MACHINE MANUFACTURING COMPANY.

*Conditional sale—Priority of Lien—Breach of Contract—Damages—Estimated profits.*

H. contracted for the purchase of certain real estate, the contract reciting that H. "and certain associates" were about to form a corporation for the purchase of this property, and for making such improvements as might be desirable, and for the conduct of the business of manufacturing and selling ice, &c. Upon the

execution of the contract with the vendors of the property, a part of the purchase money, furnished by an Investment corporation, one of the "associates," was paid by H., and shortly after the execution of the contract, H. entered into a written agreement with the Investment corporation, in which the details for the organization of the Maryland Ice Company were fully set forth, and the whole scheme for its formation was to be prepared under the direction of the solicitors of the Investment corporation. By this agreement H. stipulated that he would convey to the ice company, when formed, the said real estate which had been partially paid for by the money of the Investment corporation. H. and S. for the interest of the Investment corporation entered into a written contract with the Arctic Manufacturing Company by which the Arctic Company agreed to construct and then to erect on the aforesaid real estate three ice manufacturing machines of a designated capacity, it being distinctly provided that the title to and property in the machines should remain in the Arctic Company until the whole purchase money was paid, and the right being reserved to the Arctic Company in case of default in any of the payments as agreed upon, to take possession of and remove said machines. H. and S. assigned this contract to the Maryland Ice Company which was formed under the directions of the Investment corporation. The Ice Company executed a mortgage to the Central Trust Company, conveying certain property, fully described, and also all property thereafter acquired, for the purpose of securing certain bonds, together with the coupons attached for the semi-annual interest. The mortgage provided that the lien created thereby should extend to the land and premises described, "and the buildings now erected or hereafter to be erected, and the plant and machinery affixed or to be affixed thereto," and that "the fixed plant and machinery hereby mortgaged, or intended so to be, shall be real estate for all the purposes of this indenture, and shall be held and taken to be fixtures and appurtenances of the said real property hereby mortgaged, and a part thereof, and shall be used and sold in connection therewith and not separate therefrom." These mortgage bonds were delivered to the Investment corporation, and P. and G. bankers, purchased some of them with knowledge of the lien of the Arctic Company on the ice machines. A bill was filed by the Central Trust Company to foreclose the mortgage for the benefit of the holders of the mortgage bonds. The Arctic Company claimed a return of the ice machines under the contract between it and H. and S., the larger part of the pur-

chase money remaining unpaid; and the Ice Company claimed the right to recoup out of the unpaid purchase money due by it on the machines, the amount of damages it had sustained by the failure of the Arctic Company to construct the machines in accordance with the contract. HELD:

That the Investment corporation having taken the bonds with notice and knowledge, acquired through their agents H. and S., and the bankers P. and G. having purchased the remainder with like notice and knowledge of the lien of the Arctic Company on the ice machines, that lien was superior to theirs and could not be defeated by them.

The failure of the Arctic Company to erect the ice manufacturing machines within the time specified in the contract, would entitle the Maryland Ice Company to recoup as damages out of the balance due the Arctic Company, the fair rental value of machines of the like capacity and character for the period during which the Arctic Company was in default.

A conjectural estimate of what might have been the profits realized had the machines been in a condition to operate, constitutes no part of such rental value, and is too speculative and contingent to form a basis for calculating damages.

The measure of damages for failure by the Arctic Company to erect the ice machines of first class materials and in a thorough and workmanlike manner, according to the provisions of the contract, would be the difference between the value of the machines as they were, and what it would have been, if the contract had been properly executed, and the Ice Company would be entitled to recoup such damages out of the unpaid purchase money.

APPEALS from the Circuit Court of Baltimore City.

The Court below (WICKES, J.) decreed that the Central Trust Company of New York was not entitled to a lien upon the machines and appurtenances erected upon the premises by the Arctic Ice Machine Manufacturing Company, and that as against the said Central Trust Company of New York, the Ice Machine Manufacturing Company was entitled to immediate possession of said machines and appurtenances, but that as against the

Maryland Ice Company, the Arctic Ice Machine Manufacturing Company was not entitled to the said machines and appurtenances until after the amount due upon the claim of the Maryland Ice Company for damages arising from the breach of contract upon the part of the Arctic Ice Machine Manufacturing Company, should have been ascertained, and such damages should have been paid. The case is stated in the opinion of this Court.

The cause was argued before Alvey, C. J., Bryan, Fowler, Page, Roberts, McSherry, and Briscoe, J.

*John H. Thomas,* for the Central Trust Company.

The machines, so affixed to the realty, would have become part thereof, subject to the mortgages thereon, even if the latter had not contained the provisions they do, as to such machinery. *Dudley and Carpenter vs. Hurst, Miller & Co.,* 67 *Md.,* 44.

A mortgagor cannot, by agreement, to which the mortgagee is not a party, made after the mortgage, prevent personalty from becoming realty, if it be so affixed to the latter as to lose its characteristics as personal property. *Walker vs. Schindel,* 58 *Md.,* 368-9; *Ford vs. Cobb,* 20 *N. Y.,* 344; *Tyler on Fixtures,* 146.

"Loose property, capable of separate ownership," may, under some circumstances, be subject, as to the mortgagee, to the conditional title of the mortgagor. But personal property, necessary for the enjoyment of the realty, for the purposes for which the latter is used, and so affixed thereto that it cannot be removed, without injury thereof and without its own practical destruction, passes to the mortgagee, free of such condition. *United States vs. New Orleans Railroad,* 12 *Wall.,* 362-3-5; *Galveston, &c., R. R. Co. vs. Cowdrey,* 11 *Wall.,* 456–66–81-2-3; *Porter vs. Pittsburg Steel Co.,* 122 *U. S.,* 279–82-3.

This distinction between loose and fixed property, is recognized in the Maryland cases and other decisions. *Walker vs. Schindel*, 58 *Md.*, 368–9; *McKim and Kennedy vs. Mason*, 3 *Md. Ch. Dec.*, 191, 6, 7, 8, 9, 201, 4; *Cumberland Union Banking Co. vs. Maryport, &c. Co., L. R. Ch. Div.*, (1892,) 421; *Holly Man. Co. vs. New Chester Water Co.*, 48 *F. R.*, 879, 88, *S. C.*, 53 *F. R.*, 19.

The title of the Trust Company to the machines is not derived from the contract between the Arctic and Sturgis and Hammond, or the assignment thereof to the Maryland, and cannot be affected by any of the provisions of that contract. The title of the Trust Company is derived from the mortgages to it and the provisions they contain, from the Arctic having voluntarily erected the machines upon the mortgaged premises, in such a way as to waive, in favor of the Trust Company, the Arctic's conditional title to them, and subject them to the operation of the mortgages. With full knowledge that the mortgages covered "the plant and machinery affixed to the mortgaged premises, and constituting or to constitute part thereof," the Arctic affixed that "plant and machinery" to the mortgaged premises, so as to constitute part thereof. With full knowledge of the provisions, that "the fixed plant and machinery hereby mortgaged or intended so to be, shall be real estate, for all the purposes of this indenture, and shall be taken to be fixtures and appurtenances of the said property hereby mortgaged and part thereof," the Arctic erected the machines, in such a way as to bring them within the letter and spirit of that provision. The Arctic and the Maryland could not, by contract between them, to which the mortgagee was not a party, prevent or impair the title of the Trust Company to the machines, which the Arctic thus voluntarily subjected and the Maryland thus permitted to be subjected, to the operation of the mortgages. If the machines had been erected on the

premises before the mortgages were executed, and had been "loose property, susceptible of separate ownership," the mortgages would, if the mortgagee had known the terms of the contract for the sale of them, have been subject to those terms. Having been affixed to the mortgaged premises *after* the mortgages were executed, they are, by the express terms of the mortgages, covered by the mortgages, whether the vendor and vendee intended that they should be or not; whether they intended that the title to them should remain in the vendor or pass to the vendee. *Hunt vs. Bay State Iron Co.*, 97 *Mass.*, 279–82; *Hamilton vs. Huntley*, 78 *Ind.*, 521; *Bass Foundry, &c. vs. Gallentine, et al.*, 99 *Ind.*, 525, 6, 7, 8, 9, 530; *Thompson vs. White Water Valley R. R. Co.*, 132 *U. S.*, 74; *Toledo, &c., R. R. Co. vs. Hamilton*, 134 *U. S.*, 296–9.

The Arctic knew this. When dealing with Sturgis and Hammond, it relied on its reservation of title to the machines, as security for the unpaid purchase money. When asked to assent to the assignment to the Maryland of its contract with Sturgis and Hammond, knowing the terms of the mortgages, it knew that the machines would become subject to them, if affixed, as they afterwards were, to buildings on the mortgaged premises. It could not so erect them and reserve a title to them, as against the mortgagee. It would not therefore assent to that assignment, until it had enquired about the organization and management of the Maryland; and had been told that it would have money enough from the proceeds of its mortgage bonds and the profits it expected to make on the machines, to pay for them. Having relied on this, it has no right now to claim that the machines are free from the lien of the mortgages, because these expectations were disappointed. *Dillon vs. Barnard*, 21 *Wall.*, 430–40; *Toledo, &c., R. R. Co. vs. Hamilton*, 134 *U. S.*, 299–300.

Central Trust Co. *vs.* Arctic Ice Machine Manuf'g Co.

All the cases which have held that fixed machinery annexed to mortgaged premises, after the execution of a mortgage, did not become subject to it, have so held, on the ground that there was nothing in the mortgage, or the other evidence to show that the mortgagee had relied on such machinery, or expected it to be so affixed, as part of his security. *Tifft, et al. vs. Horton, et al.*, 53 *N. Y.*, 377–81–2–3; *New Chester Water Co. vs. Holly Manuf'g Co.*, 53 *F. R.*, 28.

In this case, the beneficiaries under the mortgages, before the execution of them, stipulated that such machines should be erected, as part of their security, and the mortgages provided that, when so erected, they should be part of the mortgaged premises and subject to the mortgages.

The recorded mortgages were constructive notice to the Arctic, even if the latter had not, as is contended, actual notice of all their provisions, and the rights of the mortgagee could not be affected by any agreement to which it was not a party. *Dunham vs. Railway Co.*, 1 *Wall.*, 254-9-67; *Toledo, &c., R. R. Co. vs. Hamilton*, 134 *U. S.*, 297-9-300; *Green vs. Early and Townshend*, 39 *Md.*, 223-9; *Abrams & Cochran vs. Sheehan*, 40 *Md.*, 446-57.

Mortgages, covering after-acquired property, are binding and operative, even as to "loose property," in favor of mortgagees who had no notice of any infirmity or condition in the title of the mortgagor. *Porter vs. Pittsburgh Steel Co.*, 122 *U. S.*, 283; *United States vs. New Orleans Railroad*, 12 *Wall.*, 362-5; *Galveston, &c., Railroad Co. vs. Cowdrey*, 11 *Wall.*, 459-64-80-1-2; *Thompson vs. White Water Valley R. R. Co.*, 132 *U. S.*, 73-4; *Toledo, &c., R. R. Co. vs. Hamilton*, 134 *U. S.*, 296-8-9-304; *Butler vs. Rahm*, 46 *Md.*, 541-48; *State vs. Northern Central Railway Co.*, 18 *Md.*, 217-18.

No one connected with the Trust Company or its beneficiaries knew the terms of the contract between the Arc-

tic and Sturgis and Hammond, until long after the mortgages were executed and long after the machines were erected.   Greenough, one of the local committee of the Investment Company, which bought the mortgage bonds, only knew that the machines had been bought on credit. He did not know that the Arctic had stipulated for a reservation of title, until they were paid for.   He did not communicate what he knew to the other members of the committee.   He had guaranteed that such machines should be erected.   As such guarantor, his interest was adverse to that of the Investment Company.    Such knowledge as he had was not, under those circumstances, imputable to that Company.   *General Ins. Co. vs. United States Ins. Co.*, 10 *Md.*, 527; *Winchester and Lemmon vs. Balto. and Susq. Railroad Co.*, 4 *Md.*, 240.   He only knew that the machines had been bought on credit, and did not know the terms of the contract.   The Investment Company, even if it knew all he knew, is not chargeable with a knowledge of these terms, unless it was gross negligence, on its part, not to inquire into them.   Still less is the mortgagee, with whom he had no connection, chargeable with such knowledge.   *Kilbourn vs. Sunderland*, 130 *U. S.*, 519; *Wilson vs. Wall*, 6 *Wall.*, 83-91.

The Arctic having broken its contract, as to the times within which the machines should be erected and ready for operation, *which was of the very essence of the contract*, and as to the character and efficiency of the machines, could not recover, in a Court of law, *on the contract.* It cannot maintain, in this proceeding, its petition for a return of the machines.   Practically, that petition is for specific performance of a contract, which it has itself broken.   At law, it could recover, if at all, only on the common counts, *quantum meruit.*   In equity, its only right is to participate in the surplus, if any there be, of funds for the payment of unsecured creditors, over and above what may be necessary for the mortgages.   In

14                    v. 77.

either proceeding, the damages resulting from its breach of contract, would be recouped from the *value*, not the *contract price* of the machines, in the condition and at the times when the Arctic ceased to work on them. *Dermott vs. Jones*, 23 *How.*, 220; *Presbyterian Church, &c. vs. Hoopes Artificial Stone Co.*, 66 *Md.*, 598; *Trustees of German Lutheran Church vs. Heise & Co.*, et al., 44 *Md.*, 455-76-77-9 *and* 480; 1 *Story's Eq.*, sec. 771; *O'Brien vs. Pentz*, 48 *Md.*, 577. These damages amount to more than the *value* of the machines; more even than the unpaid purchase money for them, under the contract.

The fair "rental value or hire" of such machines as the Arctic contracted to erect, in the building intended and reserved for their use, from the times at which, under the contract, they ought to have been completed, to the time at which the Arctic ceased to work on them, is a proper standard of damages, for delay in completing them. The profits which could have been realized from them, during that interval, are proper to be considered, in estimating such "rental value or hire." *Balto. & Ohio Railroad Co. vs. Brydon, &c.*, 65 *Md.*, 198, 200, 217, 218, 222, 232; *Wood vs. State, use of White & Co.*, 66 *Md.*, 61, 63, 64, 65, 67.

Damages which one party to a contract has sustained, by breach on the part of the other, of any provision of it, may always be recouped, from the amount the party so damaged would otherwise owe. *Warfield vs. Booth*, 33 *Md.*, 71-2-3-4.

Although a Court of equity has, ordinarily, no power to award damages to a plaintiff, when they alone are affirmatively sought, it has jurisdiction to award them, as incidental to other relief, which is within its jurisdiction. In all cases it can award them to a defendant, by way of set-off or recoupment, when allowing to a plaintiff a claim or right, which would, otherwise, work injustice. 1 *Story's Eq.*, secs. 749, 796; *Lincoln vs. Quynn*, et al., 68 *Md.*, 299, 306.

The mortgagee having a valid lien on the machines, the petition of the Arctic for return of them, ought to have been dismissed, without reference to the state of accounts between it and the Maryland.

The decree below is that the mortgagee has no lien on the machines, as against the Arctic, even to the extent of the title or lien of the mortgagor. It requires the Arctic to pay to the Maryland, damages resulting from breach of contract by the former, as a recoupment against the unpaid purchase money. Surely the lien of the mortgagee on the machines is good, to the extent of that of the mortgagor. If they cannot be taken from the Maryland, without payment of damages, it is difficult to understand on what principle they can, without such payment, be taken from the Trust Company, which is entitled by the mortgages from the Maryland, to a lien on all of *its* rights in and to the machines. The damages, when ascertained, are a payment, entirely or *pro tanto*, a reduction or extinguishment, as the case may be, of the unpaid purchase money. If they amount to as much, the Maryland will be entitled forever to retain them. If they amount to less, it will be entitled to retain them, until the damages are paid by the Arctic. The mortgagee has a lien on all of these rights, in either contingency. Its lien, at least, covers all these rights of the Maryland. It may cover more. It cannot cover less.

*Frank Gosnell*, and *Thomas M. Lanahan*, for the Arctic Ice Machine Manufacturing Company.

The Arctic Company is entitled to a return of the ice machines, by virtue of the clause of the original agreement, "that the *title and ownership* of said apparatus and appurtenances shall remain in said Arctic Company, until the full purchase money is paid, and upon default of payment, it shall have the right to take possession

and remove the same;" and this is so whether the machines have become fixtures, or still remain personal property.

It makes no difference that the Maryland Company, the vendee of said machines, executed mortgages which in terms cover after-acquired property; for whilst, as between *mortgagor* and *mortgagee*, if fixtures, the lien of the mortgagee might attach, the superior equity of the Arctic Company arises and will be upheld, not only against the Maryland Company, the mortgagor, but as against the Central Trust Company, the mortgagee, and the holder of the bonds secured thereby, because the bondholders (the London Company and Poor & Greenough) were also large stockholders of the Maryland Ice Company, and not only had knowledge of the *existence* of the contract with the Arctic Company containing the reservation of its lien, but the proof abundantly shows they had *actual knowledge* of the Arctic Company's rights in the premises. Moreover, the holders of said bonds did not acquire them upon the security of said machines, because they were not placed upon the premises until long after said mortgages were executed and recorded, and after said bonds were purchased.

The claim set up by the Central Trust Company and the Maryland Ice Company, that the Maryland Company has suffered damages in an amount greater than the balance of the purchase money for the machines, and that, therefore, the Arctic Company is not entitled to this return, cannot prevail.

1. Because the defendant having *accepted* the machines, such acceptance *became final* by the very terms of the contract, and the balance of the purchase money became payable; therefore, the only claim that the Maryland Company can rightfully make, is *that fixed by the contract,* to wit: An abatement of interest on the credit payments for such length of time as the erection

and completion of the machines were delayed; in other words, damages for delay in putting up the machines was to be compensated by a corresponding delay in payment of credit instalments.

2. Because the damages alleged and sought to be established by the evidence are for *"estimated profits,"* which being purely speculative and too remote, no recovery can be had in respect thereof.

The clause in the Arctic Company's contract *retaining title to and ownership* of the machines until the full payment of the purchase money, has been in use for many years, and is generally found in contracts relating to sales on credit of machinery and other property; questions arising upon similar provisions have been repeatedly before the Courts and invariably held effective, not only as between the parties, but in cases of personal property; have been held to be binding also upon innocent purchasers for value and without notice. *Harkness vs. Russell,* 118 *U. S.,* 663.

This doctrine has been upheld in Maryland as to third persons when the purchaser or mortgagee has actual knowledge of the terms of the original sale, or has information of matters which fairly put him on inquiry; for having such information he is chargeable with notice of every fact which that inquiry would have ascertained. *Higgins vs. Lodge, et al.,* 68 *Md.,* 229; *Lincoln vs. Quynn, et al.,* 68 *Md.,* 305; *Abrams & Cochran vs. Sheehan,* 40 *Md.,* 446, 457. See also, *Wood vs. Carpenter,* 101 *U. S.,* 141. And notice to the agent of a corporation is sufficient. *Connecticut General Life Ins. Co. vs. Burnstine,* 131 *U. S.,* (*Appendix,*) *CLIII, CLIV, CLV.* And the rule holds good whether the articles sold have become fixtures or not. *Holly Mfg. Co. vs. New Chester Water Co.,* 48 *Fed. Rep.,* 879, 888, 890; *Cumberland Union Banking Co. vs. Maryport, &c., Co.,* (1892,) *L. R.,* 1 *Ch.,* 415, 421, 425; *Walker vs. Schindel,* 58 *Md.,* 360–8; *Northern*

*Central Rwy. Co. vs. Canton Co.,* 30 *Md.,* 347, 352, &c.; *Tifft, et al. vs. Horton,* 53 *N. Y.,* 377, 381, 383, 384; *Ford vs. Cobb,* 20 *N. Y.,* 344.

No matter how firmly attached to the freehold, the machines in controversy remained *personal property,* by virtue of the agreement of the parties. This was expressly decided in *Walker vs. Schindel,* 58 *Md.,* 360, &c.

The question relating to the claim for damages set up by the Maryland Ice Company is, we think, clear and free from difficulty. See *Chase, et al. vs. Winans,* 59 *Md.,* 475, 479, 480; *Whitaker vs. Newman,* 2 *Hare,* 300.

What damages, if any, are shown by the evidence to have been sustained by the Maryland Ice Company? It was said by the learned Judge, in his opinion, that the machines were accepted, with a reservation of the right to claim damages for *delay in the completion of the machines.* This claim for damages *for delay* is clearly the only one that the Maryland Company can maintain.

What are the provisions of the contract which are to govern as to this question of damages? We find it stipulated that "if the said refrigerating apparatus does not accomplish the results hereinbefore promised and agreed upon by the said Arctic Ice Machine Manufacturing Company, by reason of *oversight or defect in construction,* then a reasonable time shall be allowed the said Arctic Ice Machine Manufacturing Company in which to accomplish said results, *but in such case any deferred payments shall be correspondingly delayed,* and when said specified results have been accomplished, said Thomas Sturgis and O. Hammond, Jr., shall accept said apparatus as complete, which acceptance shall be final, and shall make said payments in the manner and form above specified; but should said Arctic Ice Machine Manufacturing Company fail to accomplish with said apparatus the results as specified, within *sixty days from the commencement of its operation* then no payment shall be considered due

and payable thereon, and the said Arctic Ice Machine Manufacturing Company shall refund the amount advanced as freight charges upon the apparatus and also any sums which shall have been paid in accordance with the above written terms; and also in case any notes shall be given in part payment, such notes shall not be payable nor presented for payment, and the said Arctic Ice Machine Manufacturing Company shall remove, (or cause to be removed) the apparatus from the premises where erected."

This provision contemplates:

1st. Delays by reason of *oversight or defect in construction*, in which event a *reasonable* time is allowed the Arctic Company within which to accomplish such results. Under this provision alone, at least two or three months would be allowed as a reasonable time to remedy such defects, (*Van Stone's Case*, 142 *U. S.*, 131-135-138,) and for such delay, the damages clearly fixed by the contract, *is interest on the balance of the purchase money*.

2d. We next find it contemplated that the machines *after completion* may not be made to accomplish the desired results, and a period of sixty days is allowed *from the commencement of their operation* within which to accomplish them, and if such results are not accomplished within said sixty days, (which, of course, are to be added to the reasonable time allowed for remedying defects,) the parties agree that the cash payment, notes, freight, &c. are to be returned, and the machines taken out. The parties to the contract took the chances of the machines being made to operate satisfactorily and contemplated at least three or four months within which to demonstrate the *capacity* of the machines; and also meant to limit the liability, in case of failure to have them ready at the times specified, to a sum equivalent to the interest on the balance of the purchase money.

Will it be supposed that the parties contemplated that unearned profits would be the measure of damages

in case of delay in erecting the machines, when as is attempted to be shown in this case, those so-called profits exceed the entire purchase money? Clearly not, for if this be so, then had the machines not been demonstrated capable of manufacturing a hundred and fifty tons of ice per day within sixty days from commencement of operation, and the Maryland Company had required them to be taken away and the cash payment returned, it could at the same time have claimed these enormous damages. This very clause entitling the Maryland Company to the return of the cash payment and requiring the Arctic Company to remove the machines, upon failure to prove the contract capacity, clearly shows that in such event the contract was to be considered as cancelled, hence the other clause that if the machines were *accepted* such act of acceptance should be *final* and binding upon the parties, and the balance of the purchase money should become payable without any abatement except to the extent of interest thereon.

The Courts have uniformly held that in such cases *"estimated profits"* being purely *speculative,* are too remote and cannot be recovered, but that a fair *"rental value"* of the property is the most reasonable standard of such damages. *Abbott vs. Gatch*, 13 *Md.*, 314, 333, 334; *Wood vs. State, use of White & Co.*, 66 *Md.*, 61, 66, 67, 68; *New York, &c., Mining Co. vs. Fraser*, 130 *U. S.*, 611; *Howard vs. Stillwell & Bierce Mfg. Co.*, 139 *U. S.*, 199.

And in the absence of evidence of a fair *"rental value,"* interest on the purchase money is the only measure of damages. *New York, &c., Mining Company vs. Fraser*, 130 *U. S.*, 611.

*Randolph Barton*, and *Skipwith Wilmer*, (with whom was *James M. Ambler*, on the brief,) for the Maryland Ice Company.

In the case of *Howard vs. Stillwell & Bierce Manufacturing Co.*, 130 *U. S.*, 199, decided 1st of March, 1891, the

Court while recognizing the general rule that anticipated profits, prevented by the breach of the contract are not recoverable as damages, says "but where such profits, which could have been realized had the contract been performed, and which have been prevented by its breach, are not open to the objection of uncertainty or remoteness, or where, from the express or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into, they are so recoverable."

This we understand agrees with the laws of Maryland, and on this point reference is made to the following authorities: *Balto. & Ohio Railroad Co. vs. Brydon, &c.,* 65 *Md.,* 198; *Warfield vs. Booth,* 33 *Md.,* 63; *Simmons vs. Brown,* 5 *R. I.,* 299; *Lacour vs. The Mayor, &c.,* 3 *Duer,* 406; *Holden vs. Lake Co.,* 53 *N. H.,* 552; *French vs. Conn. River Lumber Co.,* 145 *Mass.,* 261; *Jaques vs. Millar, L. R.,* 6 *Ch. Div.,* 153; *Simpson vs. The London and North Western Railway Co., L. R.,* 1 *Q. B. Div.,* 274; *Richardson vs. Chynoweth,* 26 *Wisconsin,* 656; *Shepard vs. Milwaukee Gas L. Co.,* 15 *Wisconsin,* 318; *Sedgwick on Damages,* (8th *Ed.*) *p.* 234, *secs.* 164, 165, 166; *Hamilton vs. Western N. C. R. R. Co.,* 96 *N. C.,* 398; *Hadley vs. Baxendale,* 9 *Exch.,* 341; *White, et al. vs. Miller, et al.,* 71 *N. Y.,* 118; *Wakeman vs. Wheeler & Wilson M'f'g Co.,* 101 *N. Y.,* 205.

In this last case the Court says: "A person violating a contract should not be permitted entirely to escape liability because the amount of the damages he has caused is uncertain. Prospective profits, so far as they can properly be proved, which would certainly have been realized but for the defendant's default are allowable as damages though the amount is uncertain. The rule that damages which are contingent and uncertain can-

not be recovered embraces only such as are not the certain result of the breach, *not such as are the certain result, but uncertain in amount.*"

There cannot be much doubt as to the damages the Maryland Ice Company is entitled to deduct, because of bad material and defects in construction. The cost to supply the deficiency is the measure. *Marsh vs. McPherson*, 15 *Otto*, 709; *Stillwell Mfg. Co. vs. Phelps*, 130 *U. S.*, 527; *Rice vs. Forsyth*, 41 *Md.*, 408.

The acceptance of the machines by the Maryland Ice Company, even without a reservation of all rights, would not have prevented it from recouping all damages it had suffered by delay, or defects, or any other departure from the contract on the part of the Arctic Company. *Rice vs. Forsyth*, 41 *Md.*, 408; *Presbyterian Church, &c. vs. Hoopes Artificial Stone Co.*, 66 *Md.*, 598; *Dermott vs. Jones*, 23 *Howard*, 230.

The contention of the Arctic Company that an equity Court has no jurisdiction to recoup damages, is disposed of by the rulings of this Court in the case of *Trustees of the German Lutheran Church, &c. vs. Heise, &c.*, 44 *Md.*, 480.

As was said in that case, there is no reason or justice in requiring the Maryland Ice Company to pay the purchase money for the machines, and then sue a company, which may be insolvent and in the hands of a receiver, to recover the damages it has suffered.

And under no circumstances can the Arctic Company recover the contract price *on the contract*. It has admitted that the work was not done at the *time* stipulated. It has been proven that *time* was of the essence of the contract. It has been shown that gross defects in construction, costing a very large sum of money to rectify, were disclosed after the acceptance of the machines in November, 1890. Defects which could not be discovered until the machines were put to work. It has

been shown that there was no waiver of defects.    Indeed
none to waive were known to the Maryland in November,
and even if they were, all rights were reserved.    Under
such circumstances the Arctic Company can only claim
what the machines were reasonably worth in November,
1890.    *Presbyterian Church, &c. vs. Hoopes Artificial Stone
Co.*, 66 *Md.*, 598.

McSHERRY, J., delivered the opinion of the Court.

On the third day of April, 1890, the Maryland Ice
Company, a body corporate, executed and acknowledged,
and on the fifth of the same month placed upon record
in Baltimore City, a mortgage to the Central Trust
Company of New York, bearing date March the first,
1890, and conveying certain property, fully described,
and also all property thereafter acquired, for the pur-
pose of securing the payment of two hundred and fifty
bonds, each for the sum of one thousand dollars, to-
gether with the coupons attached for the amount of the
semi-annual interest; and at the same time it executed
and acknowledged a second mortgage to the same trus-
tee upon the same property, with a like provision as to
after-acquired property, to secure the payment of one
hundred and ten other bonds, each for the sum of one
thousand dollars, with similar interest coupons attached.
On September the first, 1891, the mortgagor made de-
fault in the payment of the coupons due on that day,
and payable in New York, and on the next day the Cen-
tral Trust Company filed a bill in the Circuit Court of
Baltimore City, for a foreclosure of the mortgage, a sale
of the mortgaged property and the appointment of a
receiver to take possession of the property of the Mary-
land Ice Company.

Simultaneously with the filing of the bill of com-
plaint the Maryland Ice Company put in an answer,
but, by the consent of the Central Trust Company, not

under oath, admitting all the allegations of the bill to be true, and consenting to the appointment of a receiver, and the Court at once passed an order appointing Ormond Hammond, Jr., such receiver. On the fourth day of the same month, the Arctic Ice Machine Manufacturing Company filed a petition in the case claiming to own certain machinery which had been affixed to the mortgaged premises after the mortgages had been recorded, but which had not been fully paid for by the Maryland Ice Company. The Central Trust Company and the Maryland Ice Company both answered this petition, and the last named company insisted that the damages which it had sustained by the failure of the Arctic Ice Machine Manufacturing Company to construct the machinery erected by it within the time and according to the specifications of its contract, were far in excess of the balance due under the contract. On March the fifteenth, 1890, Thomas Sturgis, of New York, and Ormond Hammond, Jr., of Baltimore, entered into a written contract with the Arctic Ice Machine Manufacturing Company of Cleveland, Ohio, by which the Arctic Company agreed to construct and then to erect in Baltimore three ice manufacturing machines of a designated capacity, and Sturgis and Hammond agreed to pay therefor the sum of one hundred and seven thousand dollars in several instalments; the first, a cash payment of thirty-five thousand dollars on April the seventh, 1890, and the residue at later periods. The contract contained the following provision: "And it is further expressly agreed, that the title and ownership of said apparatus and appurtenances shall remain in said Arctic Ice Machine Manufacturing Company, until each of the aforesaid payments shall have been fully made; and in case of default in any of said payments when due, said Arctic Ice Machine Manufacturing Company shall have thereupon the right to take possassion of and remove said apparatus

and appurtenances." On March twenty-first, 1890, the Maryland Ice Company was incórporated under the laws of New Jersey, and on the third of April following it executed the mortgages to which allusion has already been made. Those mortgages, as heretofore stated, bear date March the first, or twenty days before the mortgagor company was · actually incorporated, and among other things provide that the lien created thereby should extend to the land and premises described, "and the buildings now erected or hereafter to be erected thereon, and the plant and machinery affixed or to be affixed thereto," and that "the fixed plant and machinery hereby mortgaged, or intended so to be, shall be real estate for all the purposes of this indenture, and shall be held and taken to be fixtures and appurtenances of the said real property hereby mortgaged and a part thereof, and shall be used and sold in connection therewith, and not separate therefrom." On May the seventh, 1890, Sturgis and Hammond assigned to the Maryland Ice Company the contract between themselves and the Arctic Compaay, the latter company having the preceding day consented that the transfer might be made. After the mortgages had been recorded the Arctic Company began the erection of the three ice manufacturing machines on the mortgaged premises in Baltimore, but owing to some delay in their construction, they were not finally accepted by the Maryland Company until November the eighth, 1890. The only payment made for them was the first instalment of thirty-five thousand dollars—the residue of seventy-two thousand dollars remains unpaid.

The Arctic Company claims a return of the machines under the provision heretofore quoted from the contract between it and Sturgis and Hammond; the Central Trust Company claims title to and property in these same machines under the mortgages from the Maryland

Ice Company, for the benefit of the holders of the mortgage bonds; and the Maryland Ice Company claims the right to recoup out of the unpaid purchase money due by it on these machines, the amount of damages it has sustained by the failure of the Arctic Company to construct the machines in accordance with the contract. These conflicting claims give rise to the several questions which were ably and elaborately argued at the Bar.

Whatever may be the law elsewhere, it is settled beyond dispute in Maryland, that a conditional sale of personal property, whereby the vendor retains the title until the purchase price has been fully paid, is perfectly valid between the vendor and the vendee, and all persons claiming under or through the latter with notice of the outstanding lien. *Hall vs. Hinks*, 21 *Md.*, 418; *Lincoln vs. Quynn, et al.*, 68 *Md.*, 299. As between the Arctic Company on the one hand and Sturgis and Hammond on the other, there can, therefore, be no doubt that the machines contracted for by them on March the fifteenth, 1890, remained the property of the vendor until paid for. And it is equally clear that no assignee of Sturgis and Hammond having notice of the Arctic Company's title, could acquire or assert any better claim than Sturgis and Hammond had. *Walker vs. Schindel*, 58 *Md.*, 360. Nor is it necessary, in order to affect the person claiming under the vendee, with notice of the vendor's lien, to show actual knowledge of the existence of that lien; for if "there be circumstances which, in the exercise of common reason and prudence, ought to put a man upon particular inquiry, he will be presumed to have made that inquiry, and will be charged with notice of every fact which that inquiry would give him." *Baynard vs. Norris*, 5 *Gill*, 483; *Green vs. Early and Townshend*, 39 *Md.*, 229; *Higgins vs. Lodge, et al.*, 68 *Md.*, 229.

Central Trust Co. *vs.* Arctic Ice Machine Manuf'g Co.

The Maryland Ice Company gave to the Central Trust Company an order dated April the first, 1890, for the delivery of the whole issue of the first mortgage bonds to the London and New York Investment Corporation; and on March the thirty-first, or one day before the date of the order, and three days before the mortgage was actually executed, the Central Trust Company agreed to deliver these bonds upon receiving notice that the mortgage had been recorded. The two hundred and fifty first mortgage bonds were delivered to the London and New York Investment Corporation not earlier than April the fifth, and that corporation still holds two hundred of them. Fifty of the two hundred and fifty bonds were purchased by Poor and Greenough, and they still hold forty-five of them. The remaining five the record does not disclose the ownership of, but if they are in the possession of *bona fide* holders for value without notice, the decree in this case will not affect their title. Had the bondholders, in whose behalf the Central Trust Company now claims the three ice manufacturing machines erected by the Arctic Company, knowledge or information, before they acquired the bonds, of the lien of the Arctic Company, or of circumstances which ought to have put them upon inquiry with respect thereto? To answer intelligently this inquiry, it will be necessary to examine some of the numerous facts contained in the voluminous record, and to contrast with them portions of the testimony delivered by several of the witnesses who have given evidence in support of their own interests.

On the twenty-eighth of February, 1890, Ormond Hammond, Jr., who has already been alluded to, entered into a written contract with the executors of William E. Hooper, deceased, for the purchase from them of certain property in the City of Baltimore. In this contract it is recited that Hammond, *"and certain associates,"*

are about to form a corporation for the purchase of this property, and for making such additions thereto and improvements thereon as may be desirable, and for the conduct of the business of manufacturing and selling ice, &c. Who these associates were the contract does not say, but further references to the record will reveal that the London and New York Investment Corporation and Poor and Greenough were among them. The price agreed to be paid was one hundred and fifty thousand dollars in cash, and one hundred and ten thousand dollars "in second mortgage bonds of the company which is to be organized to operate said property as above set forth." It was further stipulated that Hammond "will erect or have erected by the company which it is thus proposed to organize, additional machinery for the manufacture of ice," which additions, it was agreed, should cost from one hundred and thirty to one hundred and fifty thousand dollars. The contract also provided that Hammond would furnish the executors of Mr. Hooper "with a letter from Poor and Greenough of New York, giving their guarantee that said improvements shall be erected upon the said property within the time limited." Upon the execution of this contract with the executors Hammond paid, as part of the one hundred and fifty thousand dollar cash payment, the sum of five thousand dollars, which money had been furnished him by the London and New York Investment Corporation to be thus applied. From this contract alone it is apparent that the London and New York Investment Corporation and Poor and Greenough were not only in consultation with Hammond, but were through him actively interested in projecting and promoting this ice manufacturing enterprise in Baltimore. In four days after the execution of this contract with Hooper's executors, that is to say, on March the fourth, 1890, Hammond entered into a written agreement with the London and New York

Investment Corporation in which the details for the organization of the Maryland Ice Company are fully set forth, and the contract between Hammond and Hooper's executors is specially referred to. The whole scheme for the formation of the ice company, all contracts, bonds, mortgages and other instruments necessary or, in the judgment of the London and New York Corporation, expedient for the purpose of carrying into effect the agreement of March the fourth were to be prepared under the direction of the Investment corporation's own solicitors, by whom also all legal questions of whatever nature relating thereto were to be settled. By this agreement Hammond stipulated that he would convey to the Maryland Ice Company when formed the property purchased from Hooper's executors, and partially paid for by the London corporation's money. Hammond further agreed that the price he was to receive for the property, and which the Maryland Company was to pay, would be eight hundred and sixty thousand dollars, "to be paid as to five hundred thousand dollars in the full paid capital stock of the company;" as to two hundred and fifty thousand dollars in first mortgage bonds, and as to one hundred and ten thousand dollars in second mortgage bonds of the Maryland Ice Company: That these mortgages were to be liens on all the property owned by the Maryland Ice Company when the mortgages should be executed, and on all property thereafter to be acquired by it, and that the London corporation would purchase two hundred thousand dollars of the first mortgage bonds, and one hundred thousand dollars of the stock for the sum of one hundred and eighty thousand dollars. It was further stipulated that two of the directors of the Maryland Ice Company should be designated for the first year by the London corporation, and that the latter corporation, so long as it held any stock or bonds of the Maryland Company, should be entitled

to keep at the expense of the Maryland Company in the
office of the last named company's treasurer, a represen-
tative who should have access to its books of account.
The London corporation agreed that it would first de-
duct from the price of the bonds and stock which it
contracted to purchase, the sum of one hundred and
fifty thousand dollars, and that it would apply the
balance to the payment of the expenses of organizing
the Maryland, and the fees of its own solicitors, and
the residue it would expend for new plant and ma-
chinery.    The one hundred and fifty thousand dollars
so deducted, less the five thousand dollars previously
advanced, were paid to Hooper's executors in full of the
cash payment provided for in Hammond's contract of
February the twenty-eighth with the executors.    All
these stipulations were entered into by the London cor-
poration seventeen days before the Maryland Ice Com-
pany was incorporated.    Thus the London corporation
provided for the creation of the Maryland Ice Company,
prescribed the terms of the purchase to be made from
Hammond by the yet unincorporated ice company, the
mode of payment, the disposition of the mortgage bonds
which had not been issued, and which were then legally
incapable of being issued, and bound the Maryland
Company in advance of its formation as to what cove-
nants its mortgages should contain.    Whilst doing all
this the London corporation knew that Hammond had
contracted to erect at a very large cost new and additional
machinery for the use of the company to be formed,
though it also knew that he was without the means to
pay therefor, because the London corporation had itself
advanced for him the comparatively small sum of five
thousand dollars to make a partial payment of the pur-
chase money to the Hoopers.    Indeed the whole subject
had been fully discussed by Hammond, Sturgis and
Greenough, the latter of whom was chairman of the

American committee of the board of directors of the London and New York Investment Corporation; and it had been so discussed long before Hammond entered into any negotiations at all. As the London corporation knew as early as February twenty-eighth, 1890, that Hammond was not able to pay for the three additional ice manufacturing machines and other appliances which he in behalf of himself and his associates had contracted with Hooper's executors should be erected, and interested as it then was in the venture under the contract of March the fourth, and bound by the last clause of that contract to apply certain sums of money to the payment of the cost of such additional plant, the most ordinary prudence would have dictated some inquiry on its part as to the terms and conditions upon which the machines were shortly thereafter purchased, had Hammond and Sturgis not been in fact its mere agents in making that purchase. The London corporation must be charged with knowledge of every thing which its agents in carrying out its instructions knew, and which its contract with Hammond and Hammond's contract with Hooper's executors disclosed. The London corporation carefully provided that every step taken towards the organization of the Maryland Ice Company should be taken under the supervision of its solicitors, and that the operations of the company when created should be conducted under the eye of two directors to be chosen by the London corporation, and that the books of account should be subject to the scrutiny and inspection of the latter's representative. It is difficult to conjecture how the London corporation could have been placed in a position of more absolute control over the whole project, or how Hammond could have been more completely clothed with the powers of an agent of the London and New York Investment Corporation from the very inception of the undertaking. The success of the enterprise

depended in a large measure upon the addition of new
plant having a greatly increased capacity, and the Lon-
don corporation knew if in no other way at least from
the very terms of the contract of February the twenty-
eighth that it, the London corporation, either through
Hammond or through the Maryland Ice Company, when
organized and incorporated, would have to provide that
machinery or the means with which to purchase it.
Whilst the London corporation was thus in possession
of the information and the facts we have indicated, and
the project was being developed under its direction,
Sturgis (who shortly afterwards became president of
the Maryland Ice Company) and Hammond went to
Cleveland, Ohio, and there entered into a contract dated
March fifteenth, 1890, with the Arctic Ice Machine
Manufacturing Company for the construction of the
three machines provided for in the agreement of Febru-
ary the twenty-eighth, and these are the machines now
in controversy. In the contract of March the fifteenth,
it was distinctly provided as has been heretofore
stated, that the title to and property in the machines
should remain in the vendor until the whole purchase
money was paid. Sturgis, whose connection with the
enterprise began prior to the purchase from Hooper,
returned from Cleveland to New York and carried with
him a copy of the written contract with the Arctic Com-
pany, but certainly not for the purpose of concealing its
contents from the persons with whom he was co-operat-
ing. The Maryland Ice Company had not yet been in-
corporated. Sturgis communicated to Greenough the
fact that a contract had been entered into for the con-
struction of these machines, named the price they were
to cost, and the company which was to build them.
Greenough acted throughout this whole transaction in
behalf of the London corporation. The New York
office of the London corporation was No. 2 Nassau

Street, in a room adjoining and communicating with the office of Poor and Greenough—the same bankers whom Hammond agreed with Hooper's executors would guarantee the erection of the new machines and additional plant. Greenough, the chairman of the American committee of the board of directors of the London corporation, who had been cognizant in behalf of his corporation and of his firm of the negotiations with Hooper, the project of forming a company to manufacture ice, the purchase of machinery for that purpose, and the contract on the part of his corporation to acquire stock and bonds in the ice company, and who knew that the London corporation was to have a voice in and a supervision over the ice company's management, in fulfilment of Hammond's agreement of February the twenty-eighth, wrote a letter to Hooper's executors under date of March the thirty-first, 1890, *before any of the mortgage bonds had been delivered, and before the mortgages had been executed,* in the following words: "Gentlemen: Referring to a contract between yourselves and Ormond Hammond, Jr., dated February 28, 1890, wherein it is stipulated that we shall arrange a guarantee that the proposed Maryland Ice Company shall erect additional machinery for manufacturing ice to the extent of one hundred and fifty tons per day, to be placed at once upon the property therein described, we now beg to state that the *Arctic Ice Machine Manufacturing Company* has entered into a contract for the furnishing of ice machines in accordance with the stipulation, and E. J. Codd & Co. have entered into a contract to supply boilers, &c., completing the manufacturing outfit, which contracts, together with the improvements now being made, will aggregate a cost in excess of $130,000. These contracts, we are assured, are from thoroughly responsible people, and supply the guarantee which you desire. We remain, gentlemen,

very truly yours, Poor & Greenough. New York, April 5th, 1890. P. S. The Maryland Ice Company has deposited with us the funds called for by the within described contracts, and we hereby agree that they shall be applied in accordance therewith. Poor & Greenough.'' Two days after the date of this letter—that is, on April the second—the Maryland Ice Company was substituted as purchaser of the property bought by Hammond from Hooper's executors, and on April the fifth—the date of the postscript—the sale of this property was ratified by the Orphans' Court of Baltimore City. Here, then, is unequivocal evidence that Greenough who signed this letter and with his own hand wrote the postscript thereto, knew at least when the letter was written, if not long before, of the existence of the Arctic Company's contract with Sturgis and Hammond; and when Greenough's connection with the project from the beginning is borne in mind, it is impossible to escape the conclusion that he also knew the provisions and terms of that contract.

When the stock and bonds were issued Hammond did not receive any of the second mortgage bonds; they were all delivered to Hooper's executors under the contract of February the twenty-eighth; he did not receive any of the first mortgage bonds or a dollar of the proceeds of their sale, and, according to his own testimony, he never received a single share of the capital stock. Though the contract of March the fourth between him and the London corporation treated him as a vendor entitled to be paid by the company to be formed, he received nothing whatever from that company after its organization, and the whole stock went into the hands of the other projectors of the concern including the London corporation. When it is remembered that, before any step was taken by Hammond towards the organization of this project, he was in consultation with the London corporation, was actually

Central Trust Co. *vs.* Arctic Ice Machine Manuf'g Co.

furnished by it at the outset with five thousand dollars to make part of the cash payment to the executors, that he subsequently submitted his contract with Hooper to the London corporation, that that corporation accepted and acted upon it and previously authorized it; that Hammond was required to be governed by the London corporation's solicitors and that he had no interest whatever in the Maryland Ice Company when created, other than as manager, it is impossible to escape the conclusion that throughout the whole scheme from first to last he and Sturgis were acting, not for themselves, but for the London corporation. The London corporation and Poor and Greenough and Sturgis were undoubtedly the "associates" referred to in the contract with Hooper— for they were the parties who controlled the Maryland Company upon its coming into existence, and since the appointment of Hammond as receiver he has been furnished by the London corporation through Poor and Greenough, upon receiver's certificates, considerably over thirty thousand dollars. It was for the London corporation and at its instance that Hammond negotiated the purchase with Hooper, and it was for it and for its benefit that he incurred the obligation to erect the three additional machines thereon; and it was to advance its interests that he and Sturgis entered into the contract with the Arctic Company. He and Sturgis were, therefore, in fact the agents of that corporation employed to develop the project for it, and the attempts to disguise their real connection with the London corporation are, whilst numerous and adroit, none the less transparent and obvious. The knowledge which Hammond and Sturgis and Greenough all had of the Arctic Company's lien was the knowledge of the London corporation, for the information which its own agents, whether called agents or not, acquired in carrying out the purposes of the corporation in this enterprise, is binding upon that corporation.

But apart from all this, it is simply incredible with the minute provisions made in the contract of March the fourth, relative to the supervision of the London corporation's solicitors over the whole subject, that the corporation should have been apprised of every thing in relation to the scheme except only the terms of the Arctic Company's contract. Chargeable as it is with all the information which the chairman of the American committee of its directors in prosecuting this business for it possessed, and with all the information which Sturgis and Hammond, who were acting for it rather than for a company yet unincorporated, acquired in executing its project, the London and New York Investment Corporation is in no position to assert that it is a *bona fide* holder of the Maryland Ice Company's bonds, without notice of the lien of the Arctic Company. To subordinate the Arctic Company's lien to that claimed by the London corporation through the Central Trust Company would permit the London corporation to repudiate the contract made by Sturgis and Hammond for that corporation. The priority asserted by the Central Trust Company for the holders of the Maryland Ice Company's first mortgage bonds is a priority claimed in behalf of the very persons whose agents and "associates" purchased the machines and contracted for the preservation of the vendor's lien thereon. The London corporation and Poor and Greenough, who are stockholders of the Maryland Company, claim, as creditors of the very company which they organized and control, and whose obligations they were aware of, a priority over the vendor of the machines, notwithstanding the knowledge and information which they had and were chargeable with when they took the bonds, and notwithstanding the fact that the very priority which they are now seeking to defeat was one created by their own agents even before the bonds were issued. No Court has ever yet held that parties

thus situated could successfully maintain such a position. It is the worst of bad faith.

The stringent provisions of the mortgage, prepared by the London corporation's own solicitors, cannot alter the question. Whatever may be the effect of the covenant subjecting after-acquired property to the lien of a mortgage, when the owner of the bonds secured by the mortgage is an innocent holder, it is too clear for discussion, that such a covenant can never be availed of, or resorted to, to further a claim which is tainted with fraud.

The London corporation having taken two hundred of these bonds, with notice and knowledge acquired through their own agents, and Poor and Greenough having taken the remainder with like notice and knowledge of the Arctic Company's lien, that lien is superior to theirs, and cannot be defeated by them.

It is true that Gans, the secretary of the London corporation, and Greenough, the chairman of the American committee, deny that they had knowledge of this lien. But if there were nothing else in the record, the letter of March the thirty-first already quoted refutes most conclusively the denial of Greenough, and whether Gans knew of the Arctic's lien or not is immaterial, inasmuch as Hammond and Sturgis, who were actual agents of the London corporation, were fully apprised of it and Gans had the opportunity to be. His failure to know was gross negligence and was tantamount to notice.

This case does not fall within that group where, as in *Winchester & Lemmon vs. Ballo. & Susq. R. R. Co.*, 4 *Md.*, 231, it has been held that notice to a president or director who is avowedly acting for himself and not in the capacity of agent, but adversely to the interests of the principal, does not, unless communicated to the board, bind the corporation. Here, as we have stated, the whole project was conducted from its inception by

Hammond, Sturgis and Greenough for and in behalf of the London corporation, and Poor and Greenough, and not adversely to their interests.

Nor can the covenant made by the Maryland Ice Company in the mortgages to the effect that all machinery affixed should be treated as real estate, and be sold as part of the realty affect the lien of the Arctic Company under the circumstances we have set forth. The result might possibly be otherwise under different conditions. But it would be a singular doctrine for a Court of equity to announce that creditors of an incorporated company could in their relation of creditors of the artificial entity take advantage of a covenant which they as projectors and organizers of the same company had procured to be made by the company they had formed, and by that covenant defeat a lien of which they were not only aware, but which had been created by their own agents. As bondholders they have no standing to destroy or to impair the lien which as projectors of the company they through their own agents established in favor of some one else. Though the Arctic Company may, by the recordation of the mortgages, have had or be chargeable with constructive notice that the Maryland Ice Company had covenanted with the bondholders that all new machinery should be considered real estate and be subject to the lien of the mortgage, still the plainest principles of natural justice would preclude any bondholder who, before he purchased a bond, participated in creating a lien in another's favor, from afterwards repudiating and destroying that lien for his own benefit and gain. Such a proceeding has never received judicial sanction and never can. This circumstance broadly distinguishes the case at bar from *Toledo, Delphos and Burlington R. R. Co. vs. Hamilton,* 134 *U. S.,* 296; *Thompson vs. White Water Valley R. R. Co.,* 132 *U. S.,* 68; *Galveston H. & H. R. Co. vs. Cowdrey,* 78 *U. S.,* 459, and many others of the same class.

We pass now to the remaining question in the case—
that is the Maryland Ice Company's claim to recoup out
of the balance due to the Arctic Company the amount
of damages sustained by the Maryland Company by
reason of the failure of the Arctic Company to erect the
machines according to the provisions of the contract of
March the fifteenth, 1890. There are two distinct claims
involved—the first, for the failure to erect the machines
within the time specified in the contract, and the second,
for defects in construction, workmanship and material.
The measure of damages for such a breach of contract
as is first above mentioned has been so repeatedly laid
down by this Court that nothing more is needed than a
brief statement of the rule without comment or discus-
sion. That which the vendee is entitled to recover for
such a breach of the vendor's undertaking, is the fair
rental value of machines of the like capacity and char-
acter for the period during which the vendor has been in
default. *Abbott vs. Gatch*, 13 *Md.*, 314; *Clagett vs. Eas-
terday*, 42 *Md.*, 617; *Wood vs. State, &c.*, 66 *Md.*, 61.
Estimated profits, which it is conjectured might have been
made out of the business, constitute no part of such
rental value, and are too speculative and contingent to
form a basis for calculating damages. There have been
cases where a recovery, measured by the amount of lost
profits, has been allowed; as in actions for a trespass
resulting in the destruction of an established business,
*Brown & Otto vs. Urner*, 40 *Md.*, 15; *Lawson vs. Price*,
45 *Md.*, 123; or, where upon a breach of a contract to
receive a certain number of tons of coal per day at an
agreed price per ton, the vendor has been permitted to
recover the difference between the contract price and
the cost of mining and delivering the coal, *Balto. &
Ohio R. R. Co. vs. Brydon*, 65 *Md.*, 198, because in all
these instances the damages resulted directly and neces-
sarily from the wrongful act of the defendant and the

profits of which the plaintiffs were deprived were susceptible of exact ascertainment and were proved with reasonable certainty. *Crabbs vs. Koontz*, 69 *Md.*, 59. In the case at bar there was no destruction of an established business, and the testimony adduced as to the extent of the loss is, at best, nothing more than a conjectural estimate of what might have been the profits realized had the machines been in a condition to operate. On November the eighth, 1890, the machines were finally accepted by the Maryland Ice Company, and the ten days test provided for in the contract was waived and dispensed with. Beyond that date, then, damages for a failure to deliver the machines cannot be computed, and from that date interest on the July payment must be allowed, and interest on the remaining payments must be calculated from the dates they were due under the contract. By the contract two of the machines ought to have been erected and in operation on June the first, 1890, and the third on the first of August following. But this was not done. The machines were, however, in partial operation considerably prior to the eighth of November, and whilst the damages which the Maryland Ice Company is entitled to recover for the failure of the Arctic Company to comply with this provision of the contract, are the rental values of like machines of equal capacity from the dates they ought to have been in operation to the time of acceptance, there must be deducted from that total rental value the fair rental value of the machines for the portion of that period that they were actually in use by or for the Maryland Ice Company—otherwise the Ice Company would recover damages for the time the machines were yielding it some benefit. There is no sufficient evidence in the record of a rental value and we are, consequently, wholly unable to reach any conclusion on this branch of the question of damages. In the computation of these damages the

Arctic Company will not be entitled to claim exemption from liability during the "reasonable time" allowed by the contract for the correction of oversights or defects "in construction," or for the sixty days within which to make the machinery accomplish the results it was warranted to produce. Those provisions obviously relate to a state of facts which did not exist, and they were intended to afford the Arctic Company an opportunity to rectify any inadequacy in the structure and in the manufacturing capacity of the machines had they been erected upon the dates specified. The damages claimed in this branch of the case are not for the failure of the machines to produce the quantity of ice per day which they were warranted to produce, but for the neglect of the Arctic Company to deliver and erect them.

With regard to the other item of damages, to wit, the alleged defective workmanship, material and construction, it is insisted by the Arctic Company that the final acceptance of the machines on November the eighth forecloses all claim. But to this we cannot accede. The contract provides that the machinery "shall be constructed of first class material, in a thorough and workmanlike manner, and of sufficient capacity to accomplish the results as set forth" in the specifications. This was a warranty that the materials and workmanship would be good, and that the machines would be fit for the purpose to which they were to be applied. *Jones vs. Just*, 3 *Q. B.*, 197; *Rice vs. Forsyth*, 41 *Md.*, 403. The acceptance of the machines was no waiver of this warranty, and does not deprive the purchaser of the right to sue on the warranty or to rely by way of defence upon a counter claim or recoupment in the vendor's action for the price, if the machines were defective in material and workmanship. *Benj. on Sales, sec.* 1356; *Day, et al. vs. Pool, et al.*, 52 *N. Y.*, 416; *Gurney, et al. vs. Atlantic, &c., R. R. Co.*, 58 *N. Y.*, 358; *Presbyterian*

*Church, &c. vs. Hoopes Artificial Stone Co.*, 66 *Md.*, 598.
And it has been held that this is so whether the defect
be latent, patent or discoverable. *Randall vs. Newson,
L. R.*, 2 *Q. B. D.*, 102. An acceptance does no more
than preclude the purchaser from rescinding the con-
tract and returning the property. The superadded
promise that the vendor would remove the machines
if, after a ten days' test, they did not fulfil the specifi-
cations, did not vacate the warranty contained in the
same contract. It gave the purchaser, if not a double
remedy, at least a choice of remedies. The purchaser
might have returned the property if it proved not to be
what was contracted for, or accepting it, maintained an
action for the breach of warranty, or recouped the
amount of damages sustained in the vendor's suit for
the price. *Warren Glass Works Co. vs. Keystone Coal
Co.*, 65 *Md.*, 547; *Douglass Axe Manufacturing Co. vs.
Gardner*, 10 *Cush.*, 88; *Seigworth vs. Leffel*, 76 *Pa. St.*,
476. The measure of damages for the breach of a war-
ranty as to workmanship and materials in cases where
the article has not been returned is the difference be-
tween its value with the defect warranted against and
the value which it would have borne without that de-
fect. *Lane, Adm'x vs. Lantz*, 27 *Md.*, 211. Or, differ-
ently stated, it is the difference between the value of
the article as it is and what it would have been if the
warranty had been true. *Tuttle vs. Brown*, 4 *Gray*, 457.
And as applicable to machinery it is the cost of repair-
ing or replacing the machinery so as to make it what it
should have been under the contract. *Brown vs. Foster*,
51 *Pa. St.*, 165. If any such damages have been sus-
tained, the Maryland Ice Company is entitled to recoup
them. As the case must be remanded that testimony
may be taken on the question of the rental value, these
damages for the other alleged breach of warranty against
defective materials and unskilful workmanship may

also be gone into beyond what is now to be found in the record on the same subject, if the parties desire to do so.

The decree appealed from determined no more than that the three ice manufacturing machines belonged to the Arctic Ice Machine Manufacturing Company, as against the Central Trust Company of New York, and directed that they should not be delivered to the claimants until the Maryland Ice Company had been paid by the Arctic the damages ascertained to be due by the latter to the former. But it did not, however, determine as the Court was fully empowered to do, *Chase, et al. vs. Winans, et al.,* 59 *Md.,* 475, the amount of those damages. The decree, as far as it goes, is correct, and for the reasons we have given, it will be affirmed; but the question of damages, though alluded to in the opinion of the learned Judge of the Circuit Court, having been left open and undisposed of by the decree, is not before us for final decision, and the cause will, therefore, be remanded that this question may be tried and determined upon the principles announced in this opinion.

> *Decree affirmed, with costs to be paid by the Central Trust Company, and cause remanded for further proceedings on the question of damages.*

(Decided 15th March, 1893.)