## DICKSON & TWEEDDALE *vs.* WILLIAM E. FOWLER.

*Action on Note Given for Services in Securing Options on Shares of Stock—Original Contract Waived—Consideration—Duress—Admissibility of Evidence—Fraud.*

Defendants, being desirous of obtaining the controlling interest in the stock of an insurance company, made a contract with the plaintiff by which the latter agreed to secure options on the greater part of the stock at $15 per share, which were to be taken up by the defendants. The contract did not provide expressly for any payment to the plaintiff for his services, but the parties expected at the time that the plaintiff would be able to get fifty-one per cent. of the stock of the company for about $12.00 per share, and would be compensated by being paid the difference between that sum and $15 per share, which was to be paid by the defendants. Afterwards, the plaintiff found himself unable to secure the stock at that price, but was obliged to pay $15 a share for the options in addition to a commission of brokers. The defendants participated in this new arrangement, but did not take up all the options, and in other respects the original

contract was changed. Before defendants had acquired the full amount of stock necessary for the control of the company, the plaintiff demanded compensation for his services and threatened to turn over his own shares of stock to the opposing faction in the company. Defendants agreed to pay $7,000, part of which was paid in cash and a note given for the balance, upon which the action in this case was brought. Defendants alleged that the note was procured by fraud and by duress, and also that it was without consideration. *Held,* that the evidence does not show that the defendants were misled by any false representations of fact made by the plaintiff at the time the note was given to him.

*Held,* further, that the promise to pay the plaintiff for his services in obtaining the options was not without consideration, since, when he found that the stock could not be procured at the price estimated at the time the original contract was made, he had a right to refuse to perform further services unless the defendants would pay for the same, and the evidence shows that the note was given for services to be thereafter rendered by the plaintiff in securing control of the company for the defendants.

*Held,* further, that the fact that the defendants feared that unless they agreed to give the note, the plaintiff would not transfer to them the shares of stock he himself owned, and would not pay a debt due to the corporation in question by a third party, which debt the plaintiff had guaranteed, did not constitute duress or undue influence.

A contract is not voidable for duress because the promisee threatened not to carry out another contract with the promisor unless it was made.

In an action to recover for services rendered in obtaining for the defendants the controlling interest in the stock of an insurance company, the evidence as to the States in which that company did business, or as to what services the plaintiff rendered to another company, is irrelevant.

In such action, the admission of evidence as to what contracts were made by the company after the defendants obtained control of it is not prejudicial error.

A witness cannot be allowed to state his opinion as to the true construction of a written contract.

Letters written by a party to a cause which are mere *ex parte* statements in his own interest are not admissible in evidence.

In an action to recover for services rendered by the plaintiff, evidence is admissible to show that the original contract relating to such services was abandoned and that they were rendered in pursuance of another agreement.

When the defendant alleges that the promissory note sued on was obtained by fraud, a letter from the defendant to the plaintiff, written after the transaction in question, expressing confidence in the plaintiff, is admissible in evidence.

*Decided January 10th, 1911.*

Appeal from the Superior Court of Baltimore City (HAR-LAN, C. J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and URNER, JJ.

*George A. Finch* (with whom was *Jas. A. Fechtig, Jr.,* on the brief), for the appellants.

*W. Calvin Chesnut* and *Charles Markell* (with whom were *Gans & Haman* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

This is a suit on the following promissory note of the appellants in favor of the appellee, which was filed with the declaration in the Court below:

"5,000.00.                          Jan. 5, 1908.

"Four months after date, we promise to pay to the order of Wm. E. Fowler, Five Thousand Dollars, at The First Nat. Bank of Baltimore, Md.

"Value received with 6% interest.

                                "DICKSON & TWEEDDALE."


In addition to the general issue plea, the defendants filed special pleas in which they charged, first, that the note "was procured by the fraud of the plaintiff," and, secondly, that the note "was procured by the fraudulent representations of the plaintiff." These special pleas were traversed by the plaintiff, and the case was tried on issues joined on the general issue plea and on the replications to the special pleas. At the trial the plaintiff offered in evidence the note sued on and rested his case, and the defendants then offered evidence in support of their pleas. During the trial the defendants reserved forty-four exceptions to the rulings of the Court on the evidence, but in the view we take of the case it will not be necessary to pass on these exceptions separately. At the conclusion of the testimony offered on behalf of the defendants, the plaintiff filed two motions to strike out certain evidence, and offered four prayers, the defendants objected to the motions and prayers being received at that time, but the Court overruled the objection, and the forty-fifth exception is to this ruling of the Court. The Court below then stated that he refused the motion to strike out the evidence, and that it was for the plaintiff to say whether he desired to offer any evidence, to which the plaintiff replied that he submitted on the prayers, when the Court further stated that as the plaintiff did not desire to offer evidence, he would ask for the prayers of the defendant. The defendants then offered seven prayers and filed a special exception to plaintiff's fourth prayer, and the forty-sixth exception is to the rejection of the defendants' prayers, the overruling of the special exception to plaintiff's fourth prayer, and to the

granting of the prayers of the plaintiff, instructing the jury, (1) that "there is no evidence legally sufficient to show that the note was procured by fraud;" (2) that "there is no evidence legally sufficient to show that the note was procured by duress;" (3) that "there is no evidence legally sufficient to show lack or failure of consideration for the note;" and (4) "that it is admitted by the pleadings and the testimony of the defendant Tweeddale that the note sued on was executed by the defendants and was delivered to the plaintiff, and that there being no evidence legally sufficient to establish any defense to said note, the verdict of the jury should be for the plaintiff for the sum of $5,000.00 with interest at six per cent., from January 5, 1909, to date."

The defenses relied on by the appellants are fraud, duress and want of consideration; the contention of the appellants. in regard to the last defense, being that the note was given for services which the appellee was bound to perform under a previous contract with the appellants. After a careful consideration of the evidence, which covers over a hundred pages of the printed record, we think it fails to establish either of these defenses.

William E. Fowler, of Baltimore City, the appellee, who was an agent of and largely interested in the German Union Insurance Company, and who was dissatisfied with its management and apprehensive of a depreciation of the stock because of its inefficiency, went to New York in August, 1908, to arrange with the appellants, Robert Dickson, Robert D. Tweeddale and George N. Thomson, co-partners trading as Dickson & Tweeddale, for the purchase by the appellants of a controlling interest in said company. As the result of the negotiation, the appellee and the appellants entered into the following contract, which was signed by the appellants and appellee but not sealed:

"This agreement made this 21st day of August, 1908, by and between Robert Dickson, George N. Thomson and Rob-

ert Dickson Tweeddale, doing business in the city of New York under the firm name and style of Dickson & Tweeddale, parties of the first part and W. E. Fowler of Baltimore, Maryland, party of the second part witnesseth that:

"Whereas the party of the second part is a large stockholder in the German-Union Insurance Company of Baltimore, and the parties of the first part are desirous of acquiring an interest as stockholders in that company. Now, therefore, in consideration of the premises and of the sum of one dollar ($1.00) lawful money of the United States and other good and valuable consideration by each of the parties hereto to the other in hand paid, the receipt of which is hereby mutually acknowledged and further in consideration of the covenants and conditions hereinafter contained, it is agreed by and between the parties hereto as follows:

"1. The party of the first part shall forthwith endeavor to secure options for the purchase of at least (51%) fifty-one per cent of the capital stock of the German-Union Insurance Company of Baltimore at ($15.00) fifteen dollars per share; said options are to be taken in the name of George N. Thomson of Larchmont, New York, and to be treated as hereinafter provided.

"2. The party of the second part shall hold or control the voting power of at least thirty-seven hundred and fifty (3,750) shares of the stock of said company so secured under said options; such ownership to be continued as hereinafter provided, the balance of the said stock so secured on the said options to be taken by the parties of the first part as hereinafter provided.

"3. The said options shall be secured by the party of the second part within sixty (60) days of the date of the execution of this agreement; said options, when obtained, to be deposited with the Baltimore Trust & Guaranty Company of Baltimore, or the First National Bank of Baltimore, or the Drovers & Mechanics National Bank of Baltimore; and the parties of the first part on being notified in writing by

the party of the second part that options on the required number of shares have been secured, shall name a date on which payment for their portion of said stock shall be made, which shall be within fifteen days thereafter unless the condition of the money market in New York City is abnormal."

By the fourth paragraph of the contract, the parties agreed that "If these aforesaid options be exercised by the parties hereto, and the control of the said German-Union Insurance Company be thereby acquired by them," they would forthwith execute an agreement that neither party should dispose of his or their stock within certain periods without the consent of the other, without the stock having been first offered to the other party at its book value. The other paragraphs of the contract provided for a change of the domicile of the company, for the appointment of general agents, etc.

The contract makes no provision for payment for the services to be rendered by the appellee in securing the options on the fifty-one per cent. of the stock, but it appears from the testimony of Mr. Dickson and Mr. Tweeddale that the matter was fully discussed during the negotiations leading up to the execution of the contract; that the appellee stated that he would be able to secure the options at $12.00 or $12.50, and that they agreed that the appellants should take the stock at $15.00 per share, and that the appellee should receive the difference for his services in securing the options. And Mr. F. Williard Smith, who was an employe of the appellants, was present during most of the conversations between the appellants and the appellee prior to the execution of the contract of August 21, 1908, and who represented the appellants from the 15th of October to the 30th of November in the subsequent transactions in Baltimore looking to securing the control of the company, when asked by appellants' counsel if he had "ever heard of any arrangement to pay Mr. Fowler any compensation by way of money for his services or for any services," said: "I was under the impression that Mr. Fowler's remuneration was to

consist principally of general agency appointments for the German-Union Company and for other companies then controlled by Dickson & Tweeddale. The question of money payment was to my mind more or less open to be dealt with according to developments." In answer to the further question: "Was there any amount stipulated for as for services?" He replied: "At the time the agreement was drawn up there was some conversation about a cash payment, but I do not think any amount was definitely decided on." It is therefore, apparent that at the time the contract was executed, it was understood that the appellee was to receive something for his services in securing the options in addition to the general agency appointments provided for in the written contract.

Mr. Tweeddale states that after the execution of the contract of August 21st, Mr. Fowler advised the appellants from time to time that he was proceeding under the contract; that about October 1st Mr. Fowler telephoned him to come to Baltimore; that when he reached Baltimore, Mr. Fowler informed him that he had been endeavoring to secure the options and had employed Wm. A. Reed & Company, brokers, to assist him; that they had tried to secure the options at less than $15.00 per share, but had been unable to do so, and that it would be necessary to pay in addition to the $15.00 per share "a brokerage of one-eighth of one per cent.," and that Mr. Fowler then introduced him to Mr. Wm. Crawford, of the firm of Wm. A. Reed & Company, and that Mr. Crawford then proceeded to assist Mr. Fowler in securing the options. Mr. Smith states that he was sent to Baltimore about the middle of October to represent the appellants in taking over the stock of the German-Union Insurance Company that had been arranged for; that it was then understood that sufficient options had been lodged with Wm. A. Reed & Co. to warrant the appellants "to go ahead with the purchase, and arrangements had been made for the day following" his "arrival for several of the principal directors

to turn in their stock to Reed & Co. and receive payment therefor;" that the Southern Insurance Company advanced $80,000.00 for this purchase; that shortly after this purchase, he took up with Mr. Fowler the matter of the stock which he was to control and discovered that some of it was hypothecated and some of it was held by Mr. Fowler's agents, and that he advised the appellant that he "did not think that Mr. Fowler could procure the voting power on the amount of stock originally stated in the contract and suggested they make some re-arrangement with him," and that he thinks in view of this development an arrangement was made between the appellants and the appellee whereby the latter agreed to relinquish a certain share of the general agency territory which he was to have had under the original contract.   It further appears from the testimony of Mr. Tweeddale that by the 20th of October, that is, within the sixty days, with the stock that had been purchased, they had secured options on fifty-one per cent. of the stock; and that stock to the value of $75,000.00 was purchased by the Southern Insurance Company.   It further appears that all of the options and shares of stock had been secured through the efforts of Wm. A. Reed & Co. and Mr. Fowler; that Mr. Fowler "did not profit" by any of the transactions; that he and Reed & Co. continued, at the request of the appellants, to secure options until about the 1st of November, some of which the appellants took up through Reed & Co. and some they never took up at all; that as late as December 5th the appellants wrote Mr. Fowler requesting him to secure one hundred shares more of the stock; that the failure of the appellants to take up all of the options was not due to the condition of the money market, and that after the appellants got control of the company, they did not enter into the agreement referred to in the fourth paragraph of the contract of August 21.

The testimony relied on by the appellants is the following testimony of Mr. Tweeddale, who, after stating that he came to Baltimore about the 7th of October, says: "Some few days

subsequent to that time, Mr. Fowler invited me to his room one evening and informed me he had been offered a sum of money by the opposing faction in the German-Union Fire Insurance Company to turn the stock that he owned or controlled to them and thereby defeat us in our attempt to get control. He said he told them he would give them an answer the next day. He stated that they had offered him $18,-000.00 and to take his stock at $15.00 per share. He asked me what it was worth to us. I told him we were paying $15.00 a share, the figure specified in the contract, which was all the stock was worth and that was all that we would pay." Mr. Tweeddale states that several days later, he sent to New York for Mr. Willard Smith, and then says: "After Mr. Smith arrived, I decided to return to New York and leave him in charge. I was in Mr. Fowler's room a day or two before I was leaving for New York, possibly the day before. I cannot fix the date of this transaction, I am now speaking of definitely, I should say around October 20th. I was in Mr. Fowler's room in the Hotel Rennert, with Mr. Fowler, Mr. Willard Smith and Mr. Grant Stockham. About eleven o'clock that evening I left the room, and Mr. Fowler followed me to the elevator, and when I was standing at the elevator he told me, he asked me when I would return from New York. I told him I would return in a day or two, in two or three days, anyway. He told me he wanted me to bring back with me $10,000 and that he wanted the money, that he didn't want any check. I asked him, what for? He said, well, if you don't the deal is all off, and I will sell my stock to the other side. I said, why didn't you tell me this before. If you had made this demand of me sometime back I would simply have returned to New York and called the deal off. But, I said, you have taken me by the throat. You know I have put out a large amount of money. You know that I cannot go backwards. And I suppose that is why you make the demand you do at this time. But, I said, I have a

contract with you, and we are going to live up to that con-
tract.   He said, that is only a gentleman's agreement.   I
said, you won't get ten cents.   Mr. Fowler said he was going
to faint, and leaned up against the wall, and attempted to
lie down on the hall floor of the hotel.   I assisted him to his
room, and Mr. Willard Smith and Mr. Grant Stockham got
some ice water, and put him on the bed, and I left the room
and returned to New York the next day or the day follow-
ing. * * * I returned to Baltimore several days later, possibly
two or three days later, and the subject of this demand was
again mentioned, was again brought up, and I informed Mr.
Fowler that if he would stand by his agreement, live up to it,
that Dickson and Tweeddale would give him $7,000.00,
which he said was perfectly acceptable." It further appears
from the testimony of Mr. Tweeddale, that the appellants
paid Mr. Fowler $1,000.00 on account of the $7,000.00 he
promised to pay him about the last of October, and that this
payment was made through Mr. Smith who took from Mr.
Fowler the following receipt: "Received of Dickson & Tweed-
dale $1,000.00 on account, balance of $5,000.00 to be paid
on completion of arrangements;" that Mr. Smith explained
to him, Mr. Tweeddale, that he wrote the receipt showing only
a balance of $5,000.00 due, with the view of trying to save
the appellants $1,000.00 in the transaction; that Mr. Smith,
so far as he was concerned or knew, was not authorized to do
that; that he did not know that Mr. Smith was going to try
to cut down the claim from $7,000.00 to $6,000.00, and that
when he heard that he had tried to do it, he repudiated it,
and said that he was going to stand by his original agree-
ment with Mr. Fowler and pay him $7,000.00, and that he
made the same statement to Mr. Fowler when he mentioned
the matter to him; that the annual stockholders' meeting was
held on January 2, 1909; that he was made President of
the company; that the nominees of the appellants were
elected as a Board of Directors, and that the appellants were
made the general agents of the company; that on the after-

noon of January 5, 1909, just as he was leaving the office to
go to New York, Mr. Fowler stopped him and presented two
notes, one for $1,000.00, at four days, and the other the note
sued on, to cover the balance of the $7,000.00 still due him,
and said that while they knew what the understanding of the
matter was, if anything should happen to Mr. Tweeddale, he
would have no evidence of what occurred, and that he would
like to have the notes signed, and that he, Mr. Tweeddale,
signed them; that between the time he promised to pay Mr.
Fowler the $7,000.00 and the time he gave the note, he was
in Baltimore a number of times; that every time he came,
he saw Mr. Fowler and advised and conferred with him in
regard to completing the purchase of the company; that Mr.
Fowler assisted him in that, advised him as to it, and "very
much planned the campaign, and was very active during the
whole time; that he wrote Mr. Fowler on Dec. 5th to secure
for the appellants one hundred shares more of the stock of
the company, and that he wrote him the letter of December
11th, in which he stated that he was not clear that they were
prepared to give the minority any representation on the
Board, but that he would talk it over with Mr. Fowler be-
fore the meeting; that he would "positively oppose placing
any of their number on either the Finance or the Executive
Committee. Our present plan is not to have any one on the
last two named committees except your good self and poss'-
bly Mr. Wilcox and ourselves. Hoping to have the pleasure
of seeing you next week, and with kindest personal regards.
I am," etc.

The statements of Mr. Tweeddale in regard to what oc-
curred after his promise to pay Mr. Fowler $7,000.00, and
his subsequent dealings and relations with Mr. Fowler are
hardly consistent with his testimony as to what occurred
when Mr. Fowler made the demand upon him. But apart
from the inherent weakness of such evidence, it fails to estab-
lish a want of consideration for the note, or that it was pro-

cured by duress. As we have said, the evidence shows that when the contract of August 21st was made, accepting the statements of Mr. Dickson and Mr. Tweeddale, it was understood by the appellants and the appellee that the latter was to be paid for his services in securing options on the stock; that he would be able to secure the options at from $12.00 to $12.50 per share, and that he would receive as compensation for such services the difference between the $12.00 or $12.50 per share and $15.00 per share which the appellants agreed to pay for the stock. The evidence further shows that when the appellee attempted to secure the options, he discovered that they could not be obtained at less than $15.00 per share, and that in order to get them at that price it would be necessary to procure the assistance of a broker at an additional cost of one-eighth of one per cent.; that he promptly notified the appellants of the fact; that through the extraordinary and united efforts of the appellee and the broker, and after encountering and overcoming unforeseen difficulties, growing largely out of the fact that a number of the stockholders believed that the appellants desired to secure control of the company for the purpose of merging it with the Southern Insurance Company which was thought to be financially embarrassed, they finally succeeded in securing a large number of options; that instead of receiving for such services, as was contemplated by the appellants and appellee, between $15,-000.00 and $19,000.00, the appellee, at the time he made the alleged demand upon the appellant, had not received anything for his services. The evidence to which we have already referred, further shows, we think, that at the time Mr. Tweeddale promised to pay the appellant the $7,000.00, the contract of August 21st had been abandoned by the parties. The options had not been taken in the name of George Thomson; they had not been "exercised" by the appellants, but a large amount of the stock on which options were secured had been purchased by the Southern Insurance Company instead;

it was known and understood by the appellants and the appellee that the latter could not, as he expected to do, then control the voting power of 3,750 shares of stock, and the evidence of what subsequently transpired shows that other features of the original contract were entirely ignored. Assuming, then, that the appellee refused to continue the performance of a contract which, by reason of unforeseen difficulties, involved a loss to him of from $15,000.00 to $19,000.00, unless the appellant made some provision for his services, we think the case is covered by the principle recognized in *Linz* v. *Schuck,* 106 Md. 220, where a contractor engaged to do certain work, and after a part performance of the contract refused to go on with the work because of substantial and unforeseen difficulties which increased the cost of performance of the contract, and the other party promised to pay an additional sum if the contractor would complete the work, and where the Court held that there was a sufficient consideration to support the promise to pay the additional sum.    See also 9 *Cyc.* 352.

But there is another aspect of the case.    If, as stated by Mr.. Tweeddale, a sufficient number of options had been secured on the 20th of October to give the appellants control of the company (about which there seems to be some doubt in view of the evidence to the effect that the appellee and the broker continued after that time and until sometime in December to secure options and stock, and that when the meeting of the stockholders was held on January 2nd, the appellants and the appellee had just enough stock to control), then the appellee, under the contract of August 21st, had no further duty to perform with reference to securing further options or stock, and the only reasonable construction of the agreement between Mr. Tweeddale and the appellee relative to the payment of the $7,000.00, which was made several days after October 20th, in the light of the evidence of what was subsequently done, and the part that they had in it,

which shows that the plan of the appellants to secure control
of the company met with persistent, determined and bitter
opposition, and that it was only through the combined and
continued efforts of the appellee, the broker and Mr. Smith,
that control was finally accomplished, is that the $7,000.00
was to be paid to the appellee for services to be thereafter
rendered in connection with securing control of the company.
Certainly these services were rendered upon the faith of the
promise to pay the $7,000.00, and Mr. Tweeddale accepted
them with that understanding, and knowing that the appellee
was otherwise under no obligation to perform them. So that
in either view of the evidence, there was sufficient considera-
tion to support the promise to pay the $7,000.00 for part of
which the note in suit was given.

In regard to the defense of duress, it is only necessary to
say that at the time the appellee made the only threat he is
said to have made, Mr. Tweeddale said to him in reply
"You won't get ten cents," and that at the time he promised
to pay the $7,000.00, and at the time the note was signed, no
threats whatever were made. *Gotwalt* v. *Neal,* 25 Md. 434;
9 *Cyc.* 431 and 443. The fact that the appellee held one
thousand shares of the stock, and the fact that he had guar-
anteed the payment of a debt due by the company of which
he was president to the German-Union Insurance Co., and
the further fact that Mr. Tweeddale was apprehensive that
if he did not promise to pay him $7,000.00, and did not sign
the note, the appellee would not pay the debt of his company,
and would sometime in the future surrender his stock to the
opposing faction of the stockholders, are not sufficient to show
that the note was procured by duress.

In support of the defense of fraud, the appellants rely
upon evidence of statements made by the appellee prior to the
execution of the contract of August 21st, that he owned or
controlled a certain amount of the stock of the German-
Union Insurance Company. But assuming that there is evi-

dence in the case to show that these statements were at the time untrue, the promise to pay the $7,000.00 was another and different undertaking, and the evidence shows conclusively that the appellants knew, at the time Mr. Tweeddale made the promise to pay the $7,000.00, that the appellee could not control the number of shares he originally expected to control, and that they knew at the time the note was given, that he controlled only one thousand shares of the stock. Under such circumstances the note cannot be said to have been procured by fraudulent representations.

It follows from what has been said, that there was no error in the granting of the first, second and third prayers of the plaintiff, and as the execution and delivery of the note were admitted by the pleadings and by Mr. Tweeddale, we see no objections to the plaintiff's fourth prayer. In regard to the forty-fifth exception, we need only say that the statements of the Court below, to which we have already referred, show that the prayers were not disposed of until after the plaintiff declined to offer any evidence in rebuttal.

The 1st, 2nd, 3rd, 4th, 4½, 5th, 6th, 10th, 11th, 12th, 16th, 19th, 20th, 22nd, 23rd and 37th exceptions have been abandoned by the appellants.

The 7th and 8th exceptions are to the refusal of the Court below to allow the witness to state in what States the German-Union Insurance Co. was entitled to do business, and the 9th exception is to the rejection of the evidence to show "what act" the appellee "performed" for the Southern Insurance Co. This evidence could not in any way have reflected upon the issues in the case and was properly excluded.

There was no error in the refusal of the Court below to allow Mr. Tweeddale to construe the contract of August 21st and to state what services the appellee performed other than those required by said contract, which is the subject of the 13th exception.

The 14th exception is to the rejection of two letters from the appellee to the appellants in regard to the business of the Southern Insurance Co. and the Guardian Fire Insurance Company, which do not reflect upon the questions involved in this case and were not admissible, and for the same reason, and the further reason that the appellants cannot establish their defense by their own unsworn statements, the letter referred to in the 15th exception was properly excluded.

The 17th and 18th exceptions are to the rulings of the Court below allowing Mr. Tweeddale to state on cross-examination what contract he obtained from the German-Union Insurance Co. after he secured control of the company, and if the evidence was not strictly relevant, the appellants were not, in the view we have taken of the case, prejudiced by its admission.

We see no objection to the evidence referred to in the 21st, 24th, 26th, 27th, 29th and 31st exceptions, which tended to show that the appellants did not take up the options secured by the appellee; the opposition the appellee encountered in his efforts to secure control of the company for the appellants, and that the stock was purchased by the Southern Insurance Company, and was offered for the purpose of showing that the original contract was abandoned by the parties, and the character and extent of the services rendered by the appellee.

The appellants were not injured by the admission of evidence showing that the Southern Insurance Company and the Guardian Fire Insurance Company went into the hands of receivers, referred to in the 25th and 28th exceptions, nor were they prejudiced by the answer of the witness to the question objected to in the 30th exception, which stated that he did not make the statement referred to in the question. .

In answer to the question objected to in the 32d exception, the witness stated that the stock purchased by the

Southern Insurance Company was subsequently taken up by the appellants, hence they were not prejudiced by the answer.

The 33d exception is to the admission of a letter from Mr. Tweeddale to the appellee, expressing his confidence in the appellee, which was admissible as reflecting upon the accuracy of his previous statements in the case that the appellee had defrauded him.

The letter referred to in the 34th and 35th exceptions, from Charles Godchauxk to Mr. Dickson, dated May 6th, 1909, stating that Mr. Dickson had been honest, etc., in his dealings with the Southern Insurance Company, was clearly inadmissible, and there was no reversible error in excluding the evidence referred to in the 36th exception, as it had already been shown that there was organized opposition on the part of the stockholders to the efforts of the appellants to secure control of the German-Union Insurance Co.

The 38th, 39th, 40th, 41st and 42nd exceptions are to the rejection of evidence to show who were the stockholders of the German-Union Insurance Co. on August 21st, and are disposed of by what we have already said in reference to the defense that the note was procured by fraudulent representations.

The remaining exceptions, the 43rd and 44th, are to the admission of evidence to show that the appellants did not take up all the options secured by the appellee, which was admissible as tending to show that the parties had previously abandoned the original contract.

Finding no reversible error in any of the rulings of the Court below, the judgment appealed from will be affirmed.

*Judgment affirmed with costs.*