**LANGE et al. v. UNITED STATES, for Use of WILKINSON.**

**No. 4744.**

Circuit Court of Appeals, Fourth Circuit.

June 10, 1941.

Eugene Frederick, of Baltimore, Md., for appellants.

J. Harry Cross, of Baltimore, Md., for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal from a judgment of the District Court rendered in a suit on a contract brought pursuant to the provisions of the Act of August 24, 1935, Chapter 642, §§ 1–4, 49 Stat. 793, 794, 40 U.S.C.A. §§ 270a–270d. See United States ·v. Lange, D.C.D.Md.1940, 35 F. Supp. 17.

On November 23, 1938, a contract was awarded to Lange Brothers (hereinafter called appellants) for the construction of a laundry building for the United States at the Naval Academy, Annapolis, Maryland. Prior to the submission of their total bid as general contractors, appellants had obtained estimates from subcontractors on the cost of sundry different items intended to be let out to these subcontractors by the general contractors. One of these items was the construction and installation in this building of a laundry or clothes chute. On November 11, 1938, C. M. Wilkinson, doing business as C. M. Wilkinson & Company (hereinafter called appellee) had made a written offer to construct this chute for the price of $347. The appellee's

offer was finally reduced to $325 and, after the Government had accepted appellants' bid of over $168,000 for the entire work, appellee's reduced offer for the chute was embodied in a formal contract of the parties, bearing the date of March 1, 1939. The entire work on the chute, undertaken by the appellee, was to be in strict accordance with the plans and specifications of the Government architect, and was subject to the approval and acceptance of both the appellants and the Government.

Subsequent to the signing of the contract of March 1, 1939, appellants mailed to appellee page 26 of the General Government Specification which read:

"8-08. Clothes Chute shall be made of corrosion-resisting steel sheets not less than 0.110 inch thick and conforming to grade 1, class 4 of specification No. 47S20a. The chute shall be of welded construction and all interior welding beads shall be ground down to a smooth, polished, continuous surface with no burns or protusions that might injure wet clothing. The chute shall be securely braced externally to withstand the stresses imposed by a 500-pound load passing through at one time. Supports shall be braced securely and anchored rigidly to the floor structure."

Appellee, despite his long experience in the sheet metal business, had never heard of the symbol No. 47S20a; and, in fixing the total amount of his original estimate, appellee had figured that the metal required was "corrosion-resisting steel sheets" of copper bearing metal, a material which cost only five cents a pound. This symbol, No. 47S20a, however, though not ordinarily used in general lines of manufacture and fabrication, was yet quite commonly used for marine work; and, unknown to appellee, the symbol definitely called for the use of "stainless steel," a material which cost about forty-six cents a pound. It was not until June, 1939, seven months after appellee's original bid and about three months after the signing of the first contract, that appellee learned the true significance of this symbol.

After the signing of the first contract, appellants had sent appellee the one page, quoted above, of the General Specifications. Appellants did not, however, forward to appellee the separate pamphlet or bulletin which is known by the designated symbol No. 47S20a. Although this bulletin was in appellants' possession, appellants evidently did not think it necessary to bring its precise contents specifically to the attention of appellee. Thus, appellee did not become aware of the meaning of the symbol until the Naval Academy authorities, in correcting the drawings submitted by appellee, referred to "Grade 1, Class 4 of Navy Department Specification No. 47S20a."

On discovering the nature of the material required by No. 47S20a, appellee sent a letter to appellants under date of June 27, 1939, explaining the mistake made by appellee in fixing the price of the chute. This letter included the following words:

"* * * We have no desire to force our design in this case where the officials have likely been impressed by something special on which they may insist by demanding that any other concern live up to the specifications to the letter and that we cannot do at the price we have given you for standard chute."

Appellants' letter of July 8, 1939, the next item in the correspondence found in the record, seemed to ignore appellee's letter of June 27th; but this letter of appellants did state that shop drawings had not yet been submitted in proper form for approval, that the building had been ready to receive the installation of the chute, that there was no reason for "any further stalling" by appellee, that unless drawings were resubmitted for approval not later than July 13th, in accordance with the requirements of the plans and specifications, appellants would find it necessary to have the work performed by others.

One of the most vital links in the whole chain of negotiations was the telephone conversation between the parties on July 14, 1939. Unfortunately, the record gives us little specific information about this conversation. It is mentioned, however, in a letter written to appellants by appellee's representative under date of July 14, 1939: "Confirming our phone message wish to say that our president has gone into the matter personally and advises us that he is willing to eliminate profit in an attempt to meet the situation which he realizes is awkward for all concerned and makes the rock bottom price of $1,071.00 and supply the chute of the metal specified in government specifications."

Appellee had arrived at an adjusted figure of $1,271. But in the course of the negotiations (evidently during the telephone conversation), appellee agreed to

deduct anything pertaining to overhead or profit, thereby deducting an amount equivalent to $200. The final figure, as thus determined, was, accordingly, $1,071.

It was brought out in the oral testimony that after appellants had been informed that appellee would not continue under the contract of March 1st, and after appellants had written the stern letter of July 8th, appellants had proceeded "to get some other prices" on the chute. One of the appellants testified that the prices in three bids thus submitted were all greater than appellee's revised price.

On July 24, 1939, appellants wrote to appellee enclosing a draft of the new contract and urging that the chute be erected not later than the week of August 14, 1939. The second formal contract embodied practically all the terms of the first and, except for the higher price and certain minor, we think, adjustments, the second contract is practically identical with the first contract. The date set for the completion of the chute was naturally advanced—the new date being September 12, 1939; the old, May 15, 1939. Again, in the first contract, it is provided that appellee shall submit, not later than ten days after the date of the contract, copies of all shop drawings and also the names of materials and appliances called for by the specifications. In the second contract, the time for submitting drawings, etc., is cut in half and, in addition, specific mention is again made for a complete set of drawings to be furnished by appellee. The final technical change was in the provision which reserved for appellants the right to cancel the contract if not properly executed and returned—the first contract allowed this right after the expiration of five days from the date set out in the contract; the second contract shortened this period to four days.

While, at first blush, the requirement in the second printed-form contract for a complete set of drawings might seem to constitute a new and additional consideration to support the new promise, a close inspection of the record reveals that these drawings had already been made before the negotiations for the second contract. They, in fact, were merely corrections of the original drawings to make these original drawings conform to the square chute, which appellee elected to build in place of the round chute. As the square chute was less difficult and less expensive to construct than the round chute, these changes in the drawings were wholly for the convenience of appellee, and thus conferred no new benefit on appellants.

Though a draft of the second contract was mailed on July 25, 1939, the contract was not formally and finally signed by the parties until August 18, 1939. Appellee explains this delay by stating that he never received the draft until the middle of August. In a letter dated August 10th, appellee told appellants that he had not yet received the draft of the contract. Appellants then forwarded a duplicate draft of the second contract on August 12, and the contract was finally signed within a week. In the final contract, the date for the completion of the chute was set for September 12, 1939. After adding an additional charge of $35 for the making of a curvature in the flare at the top of the chute, appellee agreed to the final contract price of $1,106.

It is quite significant, we think, that from July 24, the date upon which the draft of the second contract was first mailed to appellee, until August 18, the date upon which the second contract was finally signed, appellants continuously urged appellee to sign the draft of the second contract. This apparent concern on the part of appellants is evidenced in the letters dated July 24th, August 5th and August 12th. It might further be observed that appellee's delay in signing from August 12th to August 18th was partially due to further negotiations between the parties as to the date to be fixed for the completion of contract.

One of the appellants testified that the chute was not installed until about September 17, 1939, which was five days after the agreed date. However, he also testified that there were other parts of the job, in addition to the chute, that were holding up the final completion of the general contract of appellants with the Government. Despite all delay, however, no penalties were ever assessed by the Government against appellants.

On November 22, 1939, appellants had made a payment of $230 on account. Also, they then had to their credit a deduction of $65.89 on account of transportation charges paid by them. After continued pressing by appellee for the full balance due, appellants mailed a check for only $29.11 and stated that this payment completed the original contract dated March

1, 1939. Appellee refused this payment and demanded that appellants pay the balance due under the second contract, namely $810.11. After appellants' continued refusal to pay, appellee filed this suit under the Act of August 24, 1935, supra. The suit was brought in the name of the United States for the use of appellee; also, the Aetna Casualty & Surety Company, the surety on appellants' bond, was joined with appellants as defendants.

Appellants maintain that the District Judge was in error in finding that the second contract was supported by adequate consideration. Their position, in brief, is that appellee, by his promise under the terms of the second contract, was to do no more than he was already under legal obligation to do under the first contract; and that, therefore, this promise by appellee in the second contract was not a valid consideration to support the promise of appellants, in the second contract, to pay additional compensation for the performance by appellee under the second contract. No objection was taken by either party to the ruling by Judge Coleman that both of the contracts in suit were consummated in Maryland and that the law of Maryland, accordingly, governed.

■ An outstanding fact in this record that impresses us is the very wide spread, or variance, that exists between the agreed prices in the first and second contracts. The price stipulated in the first contract ultimately proved to be less than one-third of the actual cost of the chute, as determined by the terms of the second contract. According to the letter of appellee's agent, dated July 14, there was a difference of $693 in the shop costs, alone, between the two different metals involved in this case. On the strength of this single factor we would be strongly tempted to conclude that there was, in fact and law, no real contract under the agreement of March 1st; for the rule seems to be well-settled that an offeree may not snap up an offer that is on its face manifestly too good to be true. See 1 Williston on Contracts, 1936, § 94; Restatement of Contracts § 71c. Had there been substantial evidence to prove that appellant possessed knowledge of the normal price of building this chute, we would have been forced to hold that appellee was not bound by the so-called first contract. In Geremia v. Boyarsky, 1928, 107 Conn. 387, 140 A.

749, 750, where the facts were far less glaring than here, the court observed:

"That a mistake through which the defendants agreed to perform the contract for a price one-third less than the total of the actual figures of their estimate was of so essential and fundamental a character that the minds of the parties never met would not seem to require discussion."

The court further indicated that even though the mistake was the result of the negligence of the defendants, relief should be granted to defendants inasmuch as the contract was still executory and inasmuch as plaintiff would not be prejudiced by the alteration. See, also, Tyra v. Cheney, 1915, 129 Minn. 428, 152 N.W. 835; cf. Germain Fruit Co. v. Western U. Teleg. Co., 1902, 137 Cal. 598, 70 P. 658, 59 L. R.A. 575. Nevertheless, the instant record is silent on this point and we, therefore, are unable to draw here those inferences which at first glance might seem to be quite obvious.

■ But, as we have impliedly indicated in our statement of the facts of this case, we cannot agree with Judge Coleman's finding that in the second contract appellee undertook something different from that which he had originally undertaken in the first contract. The extension of time for the completion of the construction and installation of the chute is obviously no additional consideration. The provision in the second contract for an additional set of drawings was included only as a mere formality in the printed forms. Actually, the new drawings were used for the sole benefit of appellee; for they constituted mere corrections of the original drawings. Furthermore, the new drawings had been made and approved before the second contract was signed. As to the provision reserving to appellants the right to cancel the contract if not properly executed within four days, we need only state that this was not a part of the actual contract but was a condition tacked on to the offer. At all events, it certainly did not constitute additional consideration.

■ We are of the opinion that with the exception of the provision for a higher price, the second contract was practically identical with the first. We think, however, that the circumstances of the instant case bring it within the spirit of the Maryland decisions that are controlling

here, and justify an affirmance of the judgment of the District Court. In the leading case of Linz v. Schuck, 1907, 106 Md. 220, 222, 228, 67 A. 286, 287, 11 L. R.A.,N.S., 789, 124 Am.St.Rep. 481, 14 Ann.Cas. 495, adherence is given to "the general rule that a promise to do, or actually doing, that which a party to a contract is already under legal obligation to do, is not a valid consideration to support the promise of the other party to the contract to pay additional compensation for such performance." This rule is also enunciated by authorities of the first rank. See 1 Williston on Contracts, 1936, § 130; Restatement of Contracts, § 76(a). But to this rule the Court of Appeals of Maryland admits an exception, an exception criticized by Williston on Contracts § 130(a), but seemingly recognized in the Restatement in § 76, Illustration 8. The exception relates to unforeseen difficulties in the performance of the contract, and is thus expressed in Linz v. Schuck, supra, 106 Md. at page 229, 67 A. at page 288, "But, where the party refusing to complete his contract does so by reason of some unforeseen and substantial difficulties in the performance of the contract, which were not known or anticipated by the parties when the contract was entered into, and which cast upon him an additional burden not contemplated by the parties, and the opposite party promises him extra pay or benefits if he will complete his contract, and he so promises, the promise to pay is supported by a valid consideration."

The contract in Linz v. Schuck called for the digging of a cellar under a store to a depth of seven feet. The house stood on a hard crust of earth three feet thick, through which the foundation did not extend. When the contractor proceeding with the work got through the crust, he found soft muddy material, and it was impossible to go on without much unexpected labor and expense to provide proper footing for the building. The contractor refused to go on until he was promised additional compensation; and this promise was held by the court to be supported by sufficient consideration and to be enforceable. It is important to note, in considering the facts of that case, that the condition of the earth beneath the house, athough unknown to the parties, could have been ascertained by tests before the first contract was signed. And such tests are not uncommonly made by building contractors before they enter into building contracts.

The same element of surprise existed as to the actual nature of the work to be done under the contract in suit. We do not suppose that appellants were aware that appellee had made an obvious mistake when he agreed in the first contract to a price that was less than one-third of the cost of installing the chute. Otherwise, the case might be decided against appellants under the rule already referred to. But there is substantial foundation in the evidence for the finding that neither party to the contract realized that the document referred to under the symbol 47S20a in the government specifications required a kind of material that could not possibly be installed for the price named in the contract. It is true that the document referred to in the government specifications was at hand, and this document could have been consulted by either party so that the true situation would have been disclosed. Indeed, the record shows that appellants had in their possession a copy of document 47S20a, and that appellee complained that appellants did not send to appellee a copy of this document. It is admitted, however, that appellee could easily have obtained a copy of document 47S20a upon application therefor to the Government. But both parties were careless in ascertaining the facts relating to the chute, just as in Linz v. Schuck the parties might by tests have ascertained the nature of the ground beneath the house. The circumstances which might make it equitable and fair to increase the contract price, and the nature of the difficulties encountered, are not the same in the two cases; but the cases are alike in that, in each, both parties were taken by a surprise which might have been avoided had either party taken the necessary precautions. We, therefore, are of the opinion that the pending case falls within the principle and spirit of the exception set out in Linz v. Schuck; and we are confirmed in this view by the disposition of the Court of Appeals of Maryland, manifested in later cases, to give a liberal application to the exception of unforeseen difficulties. See Dickson & Tweeddale v. Fowler, 1911, 114 Md. 344, 79 A. 519; People's Banking Co. v. Fidelity & Deposit Co., 1934, 165 Md. 657, 170 A. 544, 171 A. 345.

For the reasons expressed above, the judgment of the District Court is affirmed.

Affirmed.