## EVERGREEN AMUSEMENT CORPORATION *v.* MILSTEAD

[No. 98, October Term, 1954.]

*Decided March 28, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Stanley B. Frosh* for the appellants.

*Jerrold V. Powers,* with whom were *Lansdale G. Sasscer* and *Sasscer, Clagett & Powers* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

The Evergreen Amusement Corporation, the appellant, operator of a drive-in movie theater, was held liable by the court, sitting without a jury, to Harold D. Milstead, the appellee, a contractor, for the balance due on a writ-

ten contract for the clearing and grading of the site of
the theater and certain extras, less the cost of completing
a part of the work and damages for delay in completion,
based on rental value of the theater property during the
period of delay and out-of-pocket costs for that time.

The appellant, by counter-claim, sought recovery of
lost profits for the period of delay. The court held the
amount claimed to have been so lost to be too uncertain
and speculative, and refused evidence proffered to sup-
port appellant's theory. The appellant makes four con-
tentions: that the damage ruling was error; that it
should have been allowed to prove a contemporaneous
oral agreement as to time of performance; that the ap-
pellee was entitled to no compensation for fill dirt sup-
plied by him to bring the property up to grade; and,
finally, that the appellee should not be permitted to re-
cover at all because he did not fully perform.

Under the terms of the contract, appellee agreed to
supply necessary materials and perform the work needed
to clear the theater site of timber, stumps and waste
material, to "grade the site as indicated on the plans"
and construct a drainage ditch on the north side of the
property and install two hundred feet of pipe. It then
provided: "At this contract price, no additional fill ma-
terial will be substituted for unsuitable material found
on the site."

The trial court found that both sides assumed when
they contracted and the work began, that the site could
be graded merely by moving the earth from certain parts
of it to other parts, and that no additional dirt from the
outside would be needed to reach the desired grade.
Preliminary engineering studies on both sides, such as
they were, relied on a contour map showing the topo-
graphy of the ground, based on a survey made by a
man who did not testify. Doubt was cast on the ac-
curacy of the map by an engineer, who explained that
the piles of debris, stumps and tree trunks on the prop-
erty when the map presumably was prepared, would
have made it difficult accurately to prepare it. The court

found that the only accurate method would have been to make a complete cross-section of the property at reasonable intervals. It found the calculations of both sides to have been in error, as the fact that after some eight thousand cubic yards of dirt were hauled in the grading was still not finished as desired, bears persuasive witness. Indeed, the parties agreed that the north side of the site should be left slightly below the planned grade so that additional dirt would not have to be brought in. In any event, it was soon discovered that the cuts and fills would not balance and that a large amount of borrow would be required. At a meeting of the parties, it was agreed that such fill dirt as was needed to bring the site up to grade would be brought in, except at the north side, and that the appellee would be paid for this borrowed dirt at sixty-eight cents a yard. This agreement is denied by the appellant but the trial court found as a fact that it was made. Two writings support the finding. One is the daily log kept by the president of the appellant, who was on the site as the work went on. It repeatedly recorded the amount of borrow brought into the job, in terms of pan-loads. The other is the bill of the appellee, which included the cost of this borrowed dirt; it was approved in writing by the president of the appellant. The appellant says that even if it did agree to pay for the extra dirt, there was no consideration for its agreement, because, under the contract, the appellee was required to furnish all materials needed. The contractor counters by pointing to the clause in the contract that at the price offered "no additional material will be substituted for unsuitable material on the site." We think the agreement to pay for the additional dirt was binding on either of two theories—that of unforeseen difficulty or that of interpretation of the contract from the conduct of the parties.

It is undenied that the owner and contractor both thought it to be a solid fact that the cuts and fills would balance. Certainly the discovery that outside fill dirt to the value of thousands of dollars—more than the whole

of the original contract cost—would be needed to reach grade, was not only evidence of mutual mistake but of revelation of unforeseen difficulty. In *Lange v. United States*, 4th Cir., 120 F. 2d 886, Judge Dobie, for the Court, pointed out that the general rule is that doing something one is under legal obligation to do, is not consideration which will support a promise to pay additional compensation therefor, and said: "But to this rule the Court of Appeals of Maryland admits an exception, an exception criticized by Williston on Contracts, Sec. 130 (a), but seemingly recognized in the Restatement in Sec. 76, Illustration 8." Judge Dobie observed that "* * * both parties were taken by a surprise which might have been avoided had either party taken the necessary precautions. We, therefore, are of the opinion that the pending case falls within the principle and spirit of the exception set out in *Linz v. Schuck;* and we are confirmed in this view by the disposition of the Court of Appeals of Maryland, manifested in later cases, to give a liberal application to the exception of unforeseen difficulties. See *Dickinson & Tweeddale v. Fowler,* 1911, 114 Md. 344, 79 A. 519; *People's Banking Co. v. Fidelity & Deposit Co.,* 165 Md. 657, 170 A. 544, 171 A. 345."

On the other theory, either the contract clearly meant what the contractor said it meant, in which case the agreement to pay for extra dirt certainly was binding and to have been expected, or, at least, was ambiguous. If the latter, determination of its real meaning can be aided by the construction the parties put upon it, as revealed by their actions. Among the officers of appellant, who agreed to pay for the outside fill, were experienced business men and drive-in theater builders. Records were kept of the amount brought in. Bills for the cost of that amount in excess of the original contract price were approved in writing by appellant. Only when shortness of funds sharpened its critical eye did it seek to repudiate the effect of its earlier actions. In *Saul v. McIntyre,* 190 Md. 31, 36, the Court said the conduct of the parties to a written contract may amount not only

to a construction of ambiguous provisions but may even evidence a subsequent modification of its terms. In *Eastern Woodworks, Inc. v. Vance*, 206 Md. 419, again it was held that the construction placed on the contract by the parties themselves may be relevant. See also *B. & O. R. R. v. State*, 45 Md. 596; *Mattingly Lumber Co. v. Equitable Bldg. & Savings Assn.*, 176 Md. 403, 408; *National Union Mtge. Corp. v. Potomac Consol. Debenture Corp.*, 178 Md. 658; *McKeever v. Washington Heights Realty Corp.*, 183 Md. 216.

There is no substance or significance to the argument that the court should have admitted evidence of a contemporaneous parol agreement that the work would be completed in thirty days. Both sides offered testimony that thirty working days was a reasonable time for the doing of the work and the court acted on this assumption. In the absence of express agreement to perform within a certain time, a reasonable time will be implied. *Markoff v. Kreiner*, 180 Md. 150; *Freeman v. Stanbern Construction Co.*, 205 Md. 71. Here the implied time and the time claimed to have been agreed upon would, from testimony of appellant's own witnesses, seem to have been identical and so, even if the proffered testimony should have been admitted, no harm came from its exclusion. Further, it is not claimed that there was an agreed time for performance of the extra work, such as the road, and yet the opening date was dependent on its completion. A reasonable time would be implied for this.

The real reliance of the Evergreen Ausement Corporation is on the slowness of the contractor in completing the work. It says that the resulting delay in the opening of the theater from June first to the middle of August cost it twelve thousand five hundred dollars in profits. It proffered a witness to testify that he had built and operated a majority of the drive-in theaters in the area, that he is in the theater equipment business and familiar with the profits that drive-in theaters make in the area, that a market survey was made in the area before the

site of the theater was selected, and that it had shown the need for such a theater in the neighborhood. It was said he would testify as to the reasonably anticipated profits during the months in question by comparing the months in its second year of operation with those in which it could not operate the year before, and would say that the profits would have been the same. His further testimony would be, it was claimed, that weather conditions, the population, and competition were all approximately the same in the year the theater opened and the following year.

We think the court did not err in refusing the proffered evidence. Under the great weight of authority, the general rule clearly is that loss of profit is a definite element of damages in an action for breach of contract or in an action for harming an established business which has been operating for a sufficient length of time to afford a basis of estimation with some degree of certainty as to the probable loss of profits, but that, on the other hand, loss of profits from a business which has not gone into operation may not be recovered because they are merely speculative and incapable of being ascertained with the requisite degree of certainty. *Restatement, Contracts*, Sec. 331, states the law to be that damages are recoverable for profits prevented by breach of contract "only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty", and that where the evidence does not afford a sufficient basis, "damages may be measured by the rental value of the property." Comment "d" says this: "If the defendant's breach has prevented the plaintiff from carrying on *a well-established business,* the amount of profits thereby prevented is often capable of proof with reasonable certainty. On the basis of its past history, a reasonable prediction can be made as to its future." (italics supplied) That damages for profits anticipated from a business which has not started may not be recovered, is laid down in 25 C. J. S., *Damages,* Sec. 42, and 15 Am. Jur., *Damages,* 157; 5 *Corbin, Con-*

*tracts,* Sec. 1022, 1023; 1 A. L. R. 156; 99 A. L. R. 938. See also *The Requirement of Certainty for Proof of Lost Profits,* 64 Harvard Law Review 317. The article discusses the difficulties of proving with sufficient certainty the profits which were lost, and then says: "These difficulties have given rise to a rule in some states that no new business can recover for its lost profits." While this Court has not laid down a flat rule (and does not hereby do so), nevertheless, no case has permitted recovery of lost profits under comparable circumstances. In *Abbott v. Gatch,* 13 Md. 314, the claim for loss of profits arose because of delay in completion of a flour mill. The Court held that the mill owner's loss was to be established by fair rental value for the time of the delay resulting from failure to complete the mill according to contract, that he could not recover estimated profits, because they were dependent upon the quality of flour available, the fluctuation of the price of flour, continuance of the mill in running order and other variants. The Court labelled the damages claimed speculative and refused to follow a Vermont case which had allowed them to be shown. The rule laid down in this case has been followed in a number of others. In *Winslow Elevator Co. v. Hoffman,* 107 Md. 621, an elevator was not installed within the specified time and was defective. The owner sought to recover loss of rents because of the refusal of prospective tenants to lease offices and the moving out of others. The Court followed *Abbott v. Gatch, supra,* and held that the claim for loss of rentals must be denied as too uncertain and remote. See also *Strasbaugh v. Steward Sanitary Can Co.,* 127 Md. 632; *Cooke v. England,* 27 Md. 14; *Wood v. State, Use of White,* 66 Md. 61; *Central Trust Co. v. Arctic Ice Machine Co.,* 77 Md. 202; *Sterling v. Marine Bank of Crisfield,* 120 Md. 396; and *Middlekauff v. Smith,* 1 Md. 329.

The appellant relies on cases in the Supreme Court of the United States and lower Federal Courts, including *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U. S. 555, 75 L. Ed. 544; *William Goldman Theaters*

*v. Loew's, Inc.*, 69 F. Supp. 103 (Affd. 164 F. 2d 1021) ; *Twentieth Century Fox Film Corp. v. Brookside Theatre Corp.*, 194 F. 2d 846 (certiorari denied 343 U. S. 942) ; *Eastman Kodak Co. v. Southern Photo Material Co.*, 273 U. S. 359, 71 L. Ed. 684. With one exception they involved existing businesses or theaters. Each claim for lost profits was based on conspiracies in restraint of trade in violation of the anti-trust statutes. While the opinions do not articulate that the damages were allowed to make effective the civil sanctions of the anti-trust statutes and, indeed, in one case, perhaps self-consciously, suggest that there is no distinction in the rules as to damages between anti-trust cases and others, nevertheless, it seems clear that the courts, in order to lay a basis for punitive triple damages, have relaxed the standards of proof in anti-trust suits to permit the establishment of lost profits as basic damages. The author of the Harvard Law Review article cited above observes: "As the courts have become more favorably impressed by the desirability of civil anti-trust remedies there has been a steady relaxation of the standard of certainty required, and recovery has even been permitted in cases where the plaintiff's business has never before made a profit, and where the business has only been in operation for a matter of months." On the other hand, the uncertain nature of the business of the theater is noted in cases which have denied damages. In *Todd v. Keene* (Mass.), 45 N. E. 81, suit was brought by a theater owner against an actor who breached his agreement to appear. It was shown that the actor was of high repute, had played the same theater in previous years in the same type of play to large audiences and that a college nearby always insured a crowded house. It was held that the court properly excluded evidence based on past experience of the management of the theater as to the amount of cash receipts to be expected from the same type of play at the same place under the same auspices. In *Broadway Photoplay Co. v. World Film Corp.*, 225 N. Y. 104, 121 N. E. 756, the Court, speaking through

Judge Cardozo, refused to allow loss of profits for failure to supply one feature film a week to a movie theater as agreed, although the proffer made and the evidence introduced would seem to have been as reliable a foundation as that in the case before us for their estimation. It would seem that a new theater would not for some time be well enough known to attract the same number of patrons it would draw after a period of operation. We think the court was right in basing the damages for delay in the completion of the site on fair rental value and the actual monetary losses incurred.

The final point relied on by the appellant merits no extended discussion. As is stated in *H. J. McGrath Co. v. Wisner,* 189 Md. 260, 267: "It is a general rule that a party who has deliberately and wilfully breached a contract cannot recover thereunder for part performance. See *Williston, Contracts,* Rev. Ed., Secs. 1473, 1474, and note 22 Ill. L. R. 315. However, some courts have allowed recovery on the basis of *quantum meruit* or *quasi* contract." The hardship of the rule requiring strict performance when applied to a contractor who, in good faith, has substantially performed compared to the inequitable advantage that it gives to an owner who receives and retains the benefit of the contractor's labor and material, has led to a qualification that the contract price, less allowance to the owner for deviations, may be recovered. The question of whether there has been substantial compliance and whether a deviation from contract requirements is wilful or justified, is ordinarily a question for the trier of the facts. *Speed v. Bailey,* 153 Md. 655; *Helmer v. Geis,* 149 Md. 86. In *Speed v. Bailey,* the Court adopted this statement of the rule: " 'When a covenant goes only to a part of the consideration of a contract, is incidental and subordinate to its main purpose, and its breach may be compensated in damages, such a breach does not warrant a rescission of the contract * * * .' By this rule, compensation in damages for slight breaches is substituted for the remedy afforded by rescission of the whole contract." The evidence in

the case before us was that the construction of the drainage ditch and the installation of the pipe was work costing $1,000 in a job which altogether cost over $13,-000. Its completion was not essential for the functioning of the theater, which opened without it having been done. Indeed, the president of the appellant said that it had not been realized that the work had not been completed until some time after the opening of the theater. The appellee's testimony was that he was told that there was no hurry about doing this phase of the contract and that he want away on a trip, intending to complete the job when he returned. After he returned, he soon found out there would be difficulties in the way of recovering the monies due him. His explanation of why he did not finish the job was that he was afraid he would not be paid. He expressed a willingness to do the work if he was assured payment. Under these circumstances, we cannot say that the trial court was clearly wrong in finding that the failure to construct the drainage ditch was a subordinate part of the undertaking, not of prime concern to the parties, and that failure to complete it was not wilful, as well as that the owner of the property could be fairly compensated by an easily calculated deduction from what it owed. *Hammaker v. Schleigh,* 157 Md. 652; *Speed v. Bailey, supra; Helmer v. Geis, supra; Robinson Construction Co. v. Barry,* 135 Md. 275; *Iron Clad Mfg. Co. v. Stanfield,* 112 Md. 360; *Presbyterian Church v. Hoopes,* 66 Md. 598.

We think that the case below was tried and decided without reversible error.

*Judgment affirmed, with Costs.*

BRUNE, C. J., dissents in part.