Dear Ms. Asti:
You have asked for our opinion concerning application of the State law that controls the disposition of revenues from the sale of "permanent seat licenses" ("PSLs") at the Baltimore football stadium. In particular, you have asked whether PSL revenues may be used to defray three categories of expenses claimed by the Baltimore Ravens ("Ravens" or "the Team"). One category includes the monthly payments made by the Ravens to the Stadium Authority for general operation and maintenance expenses of the stadium; a second category consists of payments made by the Ravens directly to vendors for "design, construction, furnishings, and leasehold improvements" to the stadium; the third category is the share of an expansion fee paid by the new Cleveland franchise that the Ravens would have received but that the National Football League ("NFL") required the Team to waive as a condition of its relocation to Baltimore.
In our opinion, the Team may not use PSL revenues to cover the payments required under its lease with the Stadium Authority for operation and maintenance expenses. Nor are the Team's own expenditures for improvements at the stadium ordinarily a permissible use of PSL revenues. The share of the expansion fee that the Team was required to forgo is properly characterized as a "loss" sustained by the Team as a result of its relocation and therefore PSL revenues may be used to cover that loss.
 I Background
A. Permanent Seat Licenses
The PSL is a contract under which a sports fan pays an advance fee for the right to purchase season tickets for a specific seat at the home games of a particular team. The PSL is not itself a ticket, but merely the right to purchase tickets. Typically, the purchaser of a PSL may retain the PSL indefinitely and sell, bequeath, or donate it, so long as he or she continues to purchase the related tickets each season. In recent years, revenues from the sales of PSLs have been used to finance the relocation of professional sports franchises and to help fund the construction and renovation of stadiums. See Piraino, A Proposal for the Antitrust Regulation of Professional Sports, 79 B.U. L.Rev. 889, 915 (1999). PSLs for tickets to Ravens games at the Baltimore football stadium range in price from $500 to $5,000, depending on the location of the seat. See www.ravenszone.net/boxoffice/season.asp (January 30, 2002).
B. State Law Governing PSL Revenues
The Maryland Stadium Authority Act governs the disposition of revenues generated by the sale of PSLs at professional sports stadiums constructed by the Stadium Authority.
See Annotated Code of Maryland, Financial Institutions Article ("FI"), § 13-724. Under the statute, PSL proceeds may be used only for:
(1) Amounts that are owed to a national sports league or association as a result of the costs of the relocation of a professional sports team to the State;
(2) The design and construction costs of necessary training facilities;
(3) The reasonable costs of moving and relocation, including:
(i) The physical movement of property;
(ii) Land and air travel costs;
(iii) Employee severance costs; and
(iv) Employee relocation costs;
(4) Amounts owed to the state or other jurisdiction from which the professional sports team has relocated and to other interested parties claiming rights as a result of the relocation of the team to the State, including any amounts paid to the other state or jurisdiction or interested parties to settle or otherwise resolve the claims;
(5) The repayment of bonds or other indebtedness incurred by or for the benefit of the professional sports team in connection with facilities that the professional sports team used or occupied in the state or other jurisdiction from which the professional sports team has relocated;
(6) Payments to the Authority; or
(7) Other reasonable costs and expenses incurred or losses sustained resulting from the relocation of the professional sports team to the State.
FI § 13-724(b). The statute directs that any PSL proceeds in excess of those expenses be paid to the Stadium Authority "for stadium construction and the continuing costs to maintain the professional sports stadium." FI § 13-724(c)(2). Excess proceeds are "not [to] accrue directly to the benefit of any individual or private entity." FI § 13-724(c)(1).
C. Legislative Audit
During a recent review of the Stadium Authority, the Legislative Auditor examined a report of the Team's expenditures related to the proceeds of PSL sales. The Team had provided the Stadium Authority with a copy of a schedule that was appended to a May 31, 2001 audit report by Arthur Andersen LLP, the Team's certified public accountant. That schedule summarized gross receipts from PSL sales by the Ravens as of January 31, 2001. The schedule also listed "gross expenditures" as of the same date, broken down into several categories. The schedule indicated that gross expenditures exceeded PSL receipts by more than $22 million.[1]
The schedule listed the following categories of expenditures[2]
by the Team:
Relocation fees paid to the NFL $ 21,800,000
Improvements to Owings Mills training facility 517,600
Costs of design and construction of new training facilities _____
 Design, construction, furnishings and leasehold improvements of PSINet Stadium 7,690,400
 Severance, relocation bonuses and other direct relocation costs 8,052,900
 Cleveland Municipal Stadium lease termination and leasehold improvements 11,550,000
Berea (Ohio) practice facility lease termination 9,898,500
Payments to the Maryland Stadium Authority 12,665,900
 Forfeiture of the Ravens' share of the Cleveland net expansion fee proceeds 15,749,900
Total gross expenditures $ 87,925,200
While the accountants' report does not affirmatively assert that the listed expenses represent permissible uses of PSL revenues, the report states that "[i]n connection with our audit, nothing came to our attention that the [Ravens were] not in compliance with" FI § 13-724.[3]
In its recent review of the Stadium Authority, the Legislative Auditor questioned whether three of these categories totaling $36,100,000 may be offset against PSL revenues under FI § 13-724. In particular, the Auditor questioned whether the inclusion of the following categories was consistent with the statute: (1) payments to the Stadium Authority; (2) design, construction, furnishings, and leasehold improvements to the football stadium; and (3) the Team's forfeiture of a portion of the new Cleveland team's expansion fee. Whether these categories are within the statutory parameters is significant in determining whether PSL proceeds exceed relocation costs, thereby triggering the Team's obligation to pay the excess proceeds to the Stadium Authority.[4]
At the behest of the Legislative Auditor, you have asked for our opinion on whether the three categories are consistent with the statute.
 II Development of Law Governing PSL Revenues
To answer your question, we must assess these types of expenses in light of the Legislature's intent when it enacted FI § 13-724 and designated the categories of expenses and losses that may be covered by PSL revenues. To ascertain legislative intent, statutory language is read not in isolation, but in context. Thus, the courts consider "external manifestations of intent or general purpose available through other evidence." State v. Bell, 351 Md. 709, 717-19, 720 A.2d 311 (1998) (internal quotations marks omitted). This "put[s] the statute . . . in its proper context and thereby avoid[s] unreasonable or illogical results that defy common sense." Adamson v. Correctional Medical Services, Inc.,359 Md. 238, 251- 52, 753 A.2d 501 (2000). The history of the PSL statute) in particular, its relation to an earlier agreement between the Team and the Stadium Authority) is informative.
A. 1995 Memorandum of Agreement
In October 1995, the Stadium Authority entered into an agreement with the owners of the NFL team then known as the Cleveland Browns to relocate that team to Baltimore. Memorandum of Agreement Among Maryland Stadium Authority, Cleveland Browns, Inc. and BSC, LLC (October 27, 1995) ("1995 Agreement").[5] Under that agreement, the Stadium Authority agreed to build a football stadium, and the Team agreed to lease the stadium for its home football games for 30 football seasons. Id. ¶ 5. The Team was not to pay rent for the use of stadium for football, but rather agreed to reimburse the Stadium Authority on a monthly basis for certain costs of operating and maintaining the stadium. Id. Para7, 10.
To defray the costs of relocation, the 1995 Agreement authorized the Team to market PSLs for seats to its games at the new stadium. 1995 Agreement para19. Under that provision, revenues from the sale of PSLs could be used to reimburse the Team for certain expenses related to the Team's move to Baltimore. The 1995 Agreement identified the following costs as eligible relocation costs:
! Any amounts owed to the NFL as a result of the relocation of the Team to Baltimore, including any relocation fee charged by the NFL and any percentage of PSL proceeds determined to be subject to sharing with the visiting team under applicable NFL rules; it being understood that the Team reserves the right to contest with the NFL whether and to what extent such amounts may be payable.
! The cost of the design and construction of the Training Facility in the Baltimore area and the improvements to the Colt's Training Facility, as provided for in [the 1995 Agreement].
! The cost of reasonable moving and relocation expenses, including, without limitation; (a) the physical movement of property, (b) land and air travel costs, (c) employee severance costs, and (d) employee relocation costs.
! Any amounts owed to the City of Cleveland or others claiming rights as a result of the relocation of the Team away from the City of Cleveland, including any amounts paid to any such party to settle or otherwise resolve such claims.
! The repayment of bonds or other indebtedness incurred by or for the benefit of the Team in connection with the construction of the Team's training facility in Berea, Ohio or other improvements or betterments to facilities used or occupied by the Team.
! Other reasonable costs and expenses incurred or losses sustained resulting from or arising out of the Team's relocation to Baltimore.
1995 Agreement, Schedule 1. If the net proceeds of PSL sales exceeded $75 million, the excess amount, up to $5 million, was to be paid to the Stadium Authority. Id.
After the 1995 Agreement became public, controversy arose over the cost to the State of attracting the Team to Baltimore and of constructing football stadiums. Concern was expressed by legislators and others that the Team's owners would enjoy a windfall from the proceeds of PSL sales. See Seat license fees criticized in Browns stadium agreement, Baltimore Sun (January 23, 1996) at p. 2B.
In apparent response to those concerns, the Team and the Stadium Authority entered into a letter agreement to "clarify" the PSL provision of the 1995 Agreement. Letter of James N. Bailey, Vice President, Cleveland Browns, Inc., to John Moag, Chairman, Maryland Stadium Authority (January 30, 1996). In that letter, the Team agreed that, if PSL proceeds exceeded the Team's relocation expenses, the Team would not retain the excess amount, but either rebate it to the purchasers of PSLs or pay it to the Stadium Authority to reduce construction costs. Id. The Team also agreed to provide a report by its certified public accountant "verifying the amount of PSL proceeds received and the amount used, or set aside for use, for relocation expenses." Id. The letter did not elaborate beyond the 1995 Agreement as to what could constitute a "relocation expense."
Public criticism of the agreement persisted and the General Assembly sought to alleviate concerns about possible windfalls to the Team's owners. See Maryland makes better deal on stadium, opposition shakes up Baltimore agreement, Washington Post at p. B01 (February 22, 1996). A number of bills were introduced in the Legislature during the 1996 session to block stadium construction or place conditions on stadium deals. See House Bills 248, 339, 362, 509, 755, 757, 1267; Senate Bills 397, 398, 399. One bill sought to prohibit the Stadium Authority from carrying out the 1995 Agreement (HB 248); others sought to restrict the sale of PSLs or the use of PSL proceeds (HB 233, HB 339, HB 509, HB 787). Two of the bills related to the relocation of the Team were ultimately enacted.
B. 1996 Legislation
1. House Bill 1267) Team Contribution to Stadium Construction Costs
In one of the bills that passed, the Legislature required that the Team contribute to the construction costs of the Baltimore stadium. House Bill 1267 amended FI § 13-712.1(4) to condition the Stadium Authority's ability to issue bonds to finance construction of the stadium on an agreement by the Team to pay $24 million toward the cost of construction.[6] Chapter 327, Laws of Maryland 1996 (House Bill 1267). Under that legislation, the lease between the Stadium Authority and the Team was to require the Team "to reimburse the Authority for $24 million in stadium construction costs including the construction, fitting out, and furnishing of the private suites that are part of the football stadium . . . ." FI § 13- 712.1(4)(ii). The legislation also required the Authority to transfer an identical sum in installments over 10 years to the State's public school construction fund. See FI § 13-715.2.
2. House Bill 509) Allocation of PSL Revenues
The General Assembly also enacted House Bill 509, which incorporated into State law, with some modification, the understanding between the Team and the Stadium Authority concerning the disposition of revenues from PSLs. Chapter 237, Laws of Maryland 1996, codified at FI § 13-724.
In setting forth the expenses and losses that may be reimbursed from PSL proceeds, the statute largely tracks Schedule 1 of the 1995 Agreement. Paragraphs 1 through 5 of FI § 13-724(b) repeat in slightly more generic language the categories in Schedule 1 that refer to the anticipated relocation expenses of the Team. Paragraph 7 repeats almost verbatim the catchall category of "other reasonable costs and expenses . . . or losses . . . resulting from the relocation" in Schedule 1. Finally, Paragraph 6 of FI § 13-724(b) lists "payments to the Authority" reflecting the fact that Schedule 1 provided for a portion of the PSL revenues exceeding $75 million to be paid to the Stadium Authority. However, unlike the 1995 Agreement, the statute does not limit the Stadium Authority's share of the PSL revenues to $5 million. And, unlike the January 1996 letter agreement, the statute does not include the option of rebating excess PSL revenues to the purchasers of PSLs.
While the General Assembly endorsed the idea that the Team should recoup its relocation costs from the sale of PSLs, it also was intent on confining the Team's use of that revenue source to those expenses. It directed that excess PSL receipts were to be paid to the Stadium Authority for stadium construction and maintenance and were not to benefit any individual or private entity. FI § 13-724(c). In an uncodified portion of the bill, the Legislature also specified that any funds paid to the Stadium Authority from PSL revenues could not be counted toward the $24 million that the Team would be obligated to contribute toward construction costs under House Bill 1267. Chapter 237, § 2, Laws of Maryland 1996.
The legislative file confirms that the Legislature intended to limit, rather than expand, the Team's use of PSL revenues. The fiscal note for the bill reported that the Team's relocation costs were expected to be $75 million. Revised Fiscal Note for House Bill 509 (March 7, 1996). However, it also observed that if relocation expenses were lower than expected, the Team would be entitled under the 1995 Agreement to keep the excess revenue up to $75 million before it was obliged to pay a portion of the PSL receipts to the State. By contrast, under the bill, "all excess revenues would accrue to the Stadium Authority." Id.; see also Floor Report of House Committee on Appropriations for House Bill 509 (1996). Thus, while the bill was generally consistent with the terms of the 1995 Agreement concerning disposition of PSL revenues, it was apparently intended to ensure that the Team did not receive a windfall from PSL revenues that exceeded its relocation costs.
 III Analysis
A. Payments to the Stadium Authority
The schedule of expenses submitted by the Team listed expenditures totaling $12,665,900 for "payments to the Maryland Stadium Authority." We understand that this sum consists of the monthly payments made by the Team under its lease agreement with the Stadium Authority. Given that these payments were not relocation expenses, the Legislative Auditor questioned whether the inclusion of this amount in the schedule was consistent with FI § 13-724.
The statute states that PSL revenues may be used for "payments to the Authority." FI § 13-724(b)(6). However, it is evident that not every payment that the Team may make to the Stadium Authority is to be reimbursed out of PSL revenues. Under the 1995 Agreement, the Team is obligated to pay the Stadium Authority for the actual operating costs of the stadium in lieu of paying rent. 1995 Agreement Para7, 10. That obligation is to last for 30 years. The Team also has a separate obligation under the 1995 Agreement to pay up to $5 million to the Stadium Authority from PSL revenues that exceed the Team's relocation costs. Id. par19. As clarified by the January 1996 letter agreement, the obligation to pay excess PSL revenues to the Stadium Authority is not capped. Nothing in the 1995 Agreement suggests that the Team can use excess PSL revenues to defray its ongoing obligation to reimburse the Stadium Authority's operating costs. To allow the Team to use PSL revenues to cover its monthly payments to the Stadium Authority for operation and maintenance costs would be to double-count those payments in assessing the Team's compliance with the 1995 Agreement.
The legislative history of FI § 13-724 demonstrates that the General Assembly was intent on avoiding any windfall to the Team from PSL proceeds. Without doubt, the statute was not designed to expand the Team's use of PSL receipts. The explicit prohibition in § 2 of House Bill 509 against using PSL proceeds for the Team's share of stadium construction costs shows an intent that PSL revenues not be used to fund other obligations owed by the Team to the Stadium Authority. In our opinion, the allowance in FI § 13-724(b)(6) for the Team to use PSL proceeds for "payments to the Authority" was intended to encompass the contingent sum — originally capped at $5 million and later uncapped — designated for the Stadium Authority in the provisions of the 1995 Agreement relating to PSL revenues.
It might be argued that FI § 13-724(c)(2), which directs that excess revenues be paid to the Stadium Authority for "stadium construction and the continuing costs to maintain the . . . stadium. . ." permits the Team to use excess PSL revenues for its monthly payments to the Stadium Authority based on certain operating and maintenance expenses. However, the reference to maintenance costs in FI § 13-724(c)(2) does not necessarily imply that the Legislature intended that the Team could cover its existing monthly obligation with PSL revenues. The 1995 Agreement also assigns responsibility for other "maintenance" expenses to the Stadium Authority without any requirement of reimbursement by the Team. See, e.g., 1995 Agreement, para10(c)-(d). Moreover, as noted above, the Team had a pre-existing obligation under paragraph 10 of the 1995 Agreement to reimburse the Stadium Authority for general operation and maintenance costs, regardless of PSL sales. Crediting those same payments against the Team's separate obligation to pay excess PSL revenues to the Stadium Authority would amount to a windfall that the statute was designed to prevent.
B. Design, Construction, and Improvements to Stadium
The schedule submitted by the Team lists expenditures totaling $7,690,000 for "design, construction, furnishings and leasehold improvements of PSINet Stadium." The Legislative Auditor noted that, while FI § 13-724(b)(2) specifically authorizes the use of PSL proceeds to pay for the design and construction of training facilities, it is silent as to similar expenditures related to the stadium. These expenses apparently do not come within any of the categories of relocation costs in FI § 13-724(b) for which the Team may use PSL revenues.
It is conceivable that such expenditures might constitute "stadium construction . . . costs," a permissible use of excess PSL proceeds by the Stadium Authority. FI § 13- 724(c)(2). However, we understand that the $7.7 million in this category was not paid to, and spent by, the Stadium Authority. In our view, the Legislature entrusted the Stadium Authority with the decision as to how to allocate excess PSL revenues for stadium construction and maintenance. Thus, the statute does not ordinarily allow the Team to recoup amounts that it has expended for "design, construction, furnishings and leasehold improvements" to the stadium out of PSL revenues.[7]
C. Forgone Expansion Fee
Finally, the Team included $15,749,000 on the list of expenditures with respect to the Team's waiver of a share of the new Cleveland team's expansion fee. As part of its agreement with the NFL to relocate the Team from Cleveland to Baltimore, the Team waived its right to a share of any expansion fee paid to the NFL by a new franchise in Cleveland. Franchise Exchange Agreement para5.3 (April 26, 1996). The expansion fee was paid by the new Cleveland team prior to the 1999 season and was shared by other teams in the league. As a result of the waiver in the Franchise Exchange Agreement, the Team did not receive a share of that fee. See Letter of Luis R. Perez, Chief Financial Officer, Baltimore Ravens, to Alison L. Asti, General Counsel, Maryland Stadium Authority (April 18, 2000).[8]
The waiver of a share of the new team's expansion fee constitutes forgone income rather than an actual disbursement of funds by the Team. The Legislative Auditor raised the question whether it qualified as an appropriate "expenditure" under the statute.
Under the Team's agreement with the NFL, the Team's waiver of its share of a future expansion fee was a condition of NFL approval of the Team's relocation to Baltimore. The 1995 Agreement between the Stadium Authority and the Team provided that PSL proceeds could be used to recoup "other reasonable cost and expenses incurred or losses sustained resulting from or arising out of the Team's relocation to Baltimore." 1995 Agreement, Schedule 1 (emphasis added). The statute contains nearly identical language. FI § 13-724(b)(7).
In our view, the waiver of a share of the expansion fee became a "loss sustained resulting from . . . the Team's relocation" when the new Cleveland team paid its fee and, pursuant to the Franchise Exchange Agreement, the NFL withheld a share of that fee from the Ravens. Cf. Evergreen Amusement Corp. v. Milstead, 206 Md. 610, 618-20, 112 A.2d 901
(1955) (damages in contract action may include "loss" of profits measured, not by out-of-pocket expense, but by whether there is reasonable certainty of amount of profits that were "prevented"). Had the Team remained in Cleveland and had the NFL awarded an expansion franchise in Baltimore or elsewhere, the Team otherwise would have shared in that fee. Moreover, the financial effect on the Team would have been the same if the NFL had not required a waiver, but simply required payment of an additional future "relocation fee" equal to the Ravens' share of the expansion fee.
In substance, the waiver of the expansion fee was a readily ascertainable cost of the Team's relocation and is properly offset against PSL revenues.
 IV Conclusion
In summary, State law does not permit the Ravens to use the revenues generated by the sale of PSLs at the Baltimore football stadium to cover its monthly payments to the Stadium Authority for operating and maintenance costs or its own expenditures for improvements to the stadium. However, the share of the expansion fee that the Team was required to forgo is properly characterized as a "loss" sustained by the team as a result of its relocation and may be recouped from revenues generated from the sale of PSLs. Assuming that the figures in the permissible categories of expenditures in the report submitted by the Ravens are accurate, it thus appears that expenditures exceed PSL revenues as of the date of that report.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Robert N. McDonald Chief Counsel Opinions Advice
[1] The schedule listed $67,076,600 in gross PSL revenues, subtracted $1,460,000 with respect to the costs associated with the marketing and sale of PSLs, and showed $65,616,000 as the figure for receipts. The report listed "gross expenditures" totaling $87,925,200. 
[2] The report did not break down these expenses or attach any documentation of these figures. For purposes of this opinion, we have assumed that the labels in the schedule appended to the Arthur Andersen report accurately describe the expenses grouped in these categories.
[3] The Stadium Authority had questioned certain categories and figures in preliminary drafts of the report. The accounting firm solicited, and received, from the Stadium Authority a copy of a letter by the Authority's General Counsel stating that the categories of expenses listed in the final schedule were appropriate under FI § 13-724. Letter of Alison L. Asti, General Counsel, Maryland Stadium Authority to Richard W. Slosson, Executive Director, Maryland Stadium Authority (August 31, 2001). The letter stated that "Arthur Andersen has permission to rely upon this letter in connection with their Report."
[4] The Legislative Auditor suggested that, if these categories of expenses may not be offset against PSL revenues, then revenues could exceed qualified expenses and the Team might be obligated to pay the excess revenues to the Stadium Authority. However, it should be noted that some relocation expenses are apparently not included in the schedule because they have not yet been paid. For example, a portion of the $29,000,000 relocation fee that the Ravens owe the NFL is to be paid in $900,000 increments over 10 years. The schedule attached to the Arthur Andersen report apparently includes only two of those incremental payments and the Ravens presumably remain obligated to pay an additional $7,200,000 in the future. Franchise Exchange Agreement Para5.1 (April 26, 1996).
[5] The Team and the Stadium Authority entered into an amended version of the 1995 Agreement in 1997. Amended and Restated Agreement By and Between Maryland Stadium Authority and Baltimore Ravens Limited Partnership (August 15, 1997). The amended agreement did not effect any significant change in the provisions pertinent to this opinion.
[6] At that time, the total cost of constructing the stadium was estimated to be $200 million. Revised Fiscal Note for House Bill 1267 (March 7, 1996).
[7] If it were documented that the Team made such expenditures at the direction of, and as the agent for, the Stadium Authority, such expenditures might be a permissible use of excess PSL revenues under FI § 13-724(c)(2). However, we have not analyzed whether such an agency relationship, if appropriately documented, would comply with other provisions of the Stadium Authority's statute and applicable State laws.
[8] The Perez letter states that each team that shared in the proceeds of the Cleveland expansion fee received $16,625,000. We understand that a smaller sum) $15,749,900) is listed in the Arthur Andersen report to reflect the smaller share each team would have received if the Ravens had also shared in that fee.
 *Page 17